# Administration of Coral Reef Resources in the Northwest Hawaiian Islands

The President may use his authority under the Antiquities Act to establish a national monument in the territorial sea and a national monument in the exclusive economic zone to protect marine resources.

The President may not establish a national wildlife refuge in the territorial sea or the exclusive economic zone using the implied power to reserve public lands recognized in *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915).

The authority to manage national monuments can, under certain circumstances, be shared between the Department of the Interior and other agencies, but the Fish and Wildlife Service must maintain sole management authority over any national wildlife refuge area within a monument. Regulations applicable to national monuments trump inconsistent fishery management plans, but the establishment of a national monument would not preclude the establishment of a national marine sanctuary in the same area.

September 15, 2000

MEMORANDUM OPINION FOR THE SOLICITOR
DEPARTMENT OF THE INTERIOR,

THE GENERAL COUNSEL
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

AND

THE GENERAL COUNSEL
COUNCIL ON ENVIRONMENTAL QUALITY

On May 26, 2000, President Clinton issued an Executive Order directing the development and protection of a scientifically based, comprehensive national system of marine protected areas. Exec. Order No. 13158, 65 Fed. Reg. 34,909 (2000). At the same time, the President also issued a Memorandum to the Secretaries of the Interior and Commerce stating that, "it is in the best interest of our Nation, and of future generations, to provide strong and lasting protection for the coral reef ecosystem of the Northwest Hawaiian Islands." Memorandum for The Secretary of the Interior and The Secretary of Commerce, *Re: Protection of U.S. Coral Reefs in the Northwest Hawaiian Islands* (May 26, 2000). In that Memorandum, the President directed both Secretaries, "working cooperatively with the State of Hawaii and consulting with the Western Pacific Fisheries Management Council, to develop recommendations within 90 days for a new, coordinated management regime to increase protection of the ecosystem and provide for sustainable use." *Id.* The President further directed that the Secretaries consider whether the President should "extend permanent protection to objects

183

of historic or scientific interest or to protect the natural and cultural resources of this important area." *Id.*

About one month after the President issued the Memorandum to the Secretaries of the Interior and Commerce, our office received a joint memorandum from the Department of the Interior, the Department of Commerce, and the Council on Environmental Quality, posing a series of legal questions relating to possible steps that the President could take to protect the marine environment of the coral reef resources of the Northwest Hawaiian Islands. Memorandum for Randolph Moss, Assistant Attorney General, Office of Legal Counsel, from John Leshy, Solicitor, Department of the Interior, James Dorskind, General Counsel, National Oceanic and Atmospheric Administration ("NOAA"), and Dinah Bear, General Counsel, Council on Environmental Quality, *Re: Request for Opinion Regarding Administration of Coral Reef Resources in the Northwest Hawaiian Islands* (June 30, 2000) ("Joint Memo").[1] We were asked whether the President could use his authority under the Antiquities Act, 16 U.S.C. §§ 431–433 (1994), to establish a national monument either in the territorial sea of the United States 3–12 miles seaward of the baseline or in the exclusive economic zone ("EEZ") 12–200 miles seaward of the baseline in order to protect coral reef resources. We were also asked whether the President could establish a national wildlife refuge in either the territorial sea or the EEZ. Finally, we were asked a series of questions relating to how such a national monument or wildlife refuge could be managed. These questions involve the relationship of a variety of statutes, including the Antiquities Act, the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C.A. §§ 1801–1802, 1811, 1851–1857 (1985 & West Supp. 2000) (in relevant part) ("MSFCMA"), the National Wildlife Refuge System Administration Act of 1966, 16 U.S.C. §§ 668dd–668ee (1994 & Supp. IV 1998) ("NWRSAA"), and the National Marine Sanctuaries Act, 16 U.S.C. §§ 1431–1445b (1994 & Supp. IV 1998) ("NMSA").

In light of the time frame within which policymakers were working, we provided a short summary of our answers on August 18, 2000. *See* Memorandum for John Leshy, Solicitor, Department of the Interior, James Dorskind, General Counsel, National Oceanic and Atmospheric Administration, and Dinah Bear, General Counsel, Council on Environmental Quality, from Randolph D. Moss,

---

[1] We also received numerous other helpful submissions from the Department of the Interior, NOAA, the Department of State, the Department of Defense, and the Environmental and Natural Resources Division of the Department of Justice. *See* Letter for Randolph Moss, Assistant Attorney General, Office of Legal Counsel, from John D Leshy, Solicitor, Department of the Interior (July 17, 2000), Letter for Randolph Moss, Assistant Attorney General, Office of Legal Counsel, from James Dorskind, General Counsel, NOAA (July 24, 2000) ("NOAA Letter"); Memorandum for Randolph Moss, Assistant Attorney General, Office of Legal Counsel, from Susan Biniaz, Assistant Legal Advisor Oceans, International Environmental and Scientific Affairs, Department of State, *Re State Department Views Regarding ENRD Memo Addressing Authority to Protect Coral Reefs in the Northwest Hawaiian Islands* (Aug 14, 2000) ("State Memo"); Letter for Randolph D. Moss, Assistant Attorney General, Office of Legal Counsel, from Michael F. Lohr, Rear Admiral, JAGC, U.S Navy, DoD Representative for Ocean Policy Affairs (Aug. 14, 2000), Memorandum for Randolph Moss, Assistant Attorney General, Office of Legal Counsel, from Lois J. Schiffer, Assistant Attorney General, ENRD, *Re: ENRD Views Regarding Authority to Protect Coral Reefs in the Northwest Hawaiian Islands* (Aug 8, 2000).

Assistant Attorney General, Office of Legal Counsel, *Re: Administration of Coral Reef Resources in the Northwest Hawaiian Islands* (Aug. 18, 2000). We explained in that memorandum that a comprehensive written opinion explaining those answers would follow in the coming weeks.

Consistent with our earlier advice, we conclude that the President could use his authority under the Antiquities Act to establish a national monument in the territorial sea. Although the question is closer, we also believe the President could establish a national monument in the EEZ to protect marine resources. We are unconvinced, however, that the President could establish a national wildlife refuge in either area based on implied authority rooted in practice. Finally, with respect to the management issues, we believe that the Department of the Interior must have management authority over any national monument, that the Fish and Wildlife Service cannot share management responsibilities with another agency over any national wildlife refuge area within a national monument, that fishery management plans issued under the MSFCMA must be consistent with regulations applicable to national monuments, and that the establishment of a national monument would not preclude the establishment of a national marine sanctuary in the same area under the NMSA.

## I. Establishing a National Monument under the Antiquities Act

### A. The Territorial Sea

The territorial sea is the area immediately adjacent to the coast of a nation. *See, e.g.*, Restatement (Third) of The Foreign Relations Law of the United States § 511(a) (1987) ("Restatement Third"). International law permits a nation to claim as its territorial sea an area up to twelve miles from its coast. *Id.* A nation is sovereign in its territorial sea. *See Legal Issues Raised by Proposed Presidential Proclamation To Extend the Territorial Sea*, 12 Op. O.L.C. 238, 240 (1988) ("OLC Territorial Sea Opinion"). Indeed, "[s]ubject to [innocent passage rules], the coastal state has the same sovereignty over its territorial sea, and over the air space, sea-bed, and subsoil thereof, as it has in respect of its land territory." Restatement Third § 512; *see also Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 234 (1804) ("The authority of a nation within its own territory is absolute and exclusive. The seizure of a vessel within the range of its cannon by a foreign force is an invasion of that territory, and is a hostile act which it is its duty to repel. But its power to secure itself from injury may certainly be exercised beyond the limits of its territory."); OLC Territorial Sea Opinion at 240 ("Indeed, a nation has the same sovereignty over the territorial sea as it has over its land territory.").

Although the United States for many years claimed a three-mile territorial sea, in 1988 President Reagan extended the territorial sea to twelve miles. Proclamation

No. 5928, 3 C.F.R. 547 (1989) ("The territorial sea of the United States henceforth extends to 12 nautical miles from the baselines of the United States determined in accordance with international law."). The proclamation noted that extension of the territorial sea "will advance the national security and other significant interests of the United States" and, consistent with international law, provided that "the ships of all countries enjoy the right of innocent passage" through the territorial sea. *Id.* The proclamation also provided, however, that it did not "extend[ ] or otherwise alter[ ] existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom." *Id.*

But for the U.S. Government's conveyance to the various states of "all right, title, and interest of the United States, if any it has, in and to all said [submerged] lands, improvements, and natural resources" up to three miles from the baseline in the Submerged Lands Act of 1953, 43 U.S.C. §§ 1301–1315 (1994) ("SLA"), the Antiquities Act would authorize the President to establish a national monument in the territorial sea up to three miles seaward of the baseline. The Antiquities Act authorizes the President "to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments." [2] The relevant issue is whether the United States "controls" the submerged lands and waters within the first three miles of the territorial sea for purposes of the Antiquities Act. Neither the Act, nor its brief attendant Congressional reports,[3] nor any case law that we were able to find sheds light on the meaning of the word "control" as used by the Act. The dictionary definition of "control," however, is "to exercise restraining or directing influence over." [4] Case law in a range of contexts interpreting the word is to the same effect.[5] Because the United States Government maintains sovereignty over the territorial sea to almost the same extent that it maintains sovereignty over its land territory, it therefore "control[s]" the area within the traditional territorial sea of three miles for purposes of the Antiquities Act.[6] Rein-

---

[2] Although the Antiquities Act refers to "lands," the Supreme Court has recognized that it authorizes the reservation of "waters located on or over federal lands." *United States v. California,* 436 U S 32, 36 n 9 (1978). *See also Cappaert v. United States,* 426 U S 128, 138–42 (1976). The Court has also made clear that the Antiquities Act can be used to protect objects of scientific interest, as well as historic interest *See id* at 142 (rejecting argument that Antiquities Act may only be used to protect archeologic sites); *Cameron v. United States,* 252 U.S. 450, 455 (1920) (upholding President's authority to establish a monument to protect the Grand Canyon)

[3] *See* S Rep No. 59–3797 (1906) (one page); H.R Rep. No. 59–2224 (1906) (eight pages).

[4] Webster's Third New International Dictionary 496 (1993); *see also* Black's Law Dictionary 330 (7th ed 1999) ("to exercise power or influence over")

[5] *See, e.g., Martin v State,* 372 N.E 2d 1194, 1197 n 5 (Ind Ct. App 1978) ("'Control' means the ability to exercise a restraining or directing influence over something."), *Speaks v. State,* 239 A 2d 600, 604 (Md App 1968) ("'Control', as used in [a drug possession statute], is given its ordinary meaning, namely, 'to exercise restraining or directing influence over'  "); *Kim v Convent of the Sacred Heart,* 1998 WL 563960, at *3 (D Conn. 1998) ("The term 'control' simply means 'the power or authority to manage, superintend, direct or oversee.' "). *See also* 17 C F R. § 230 405 (2000) (securities regulation) ("The term *control*  . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person  .").

[6] The fact that under international law and the terms of the 1988 proclamation nations other than the United States retain the right of "innocent passage" through the three mile territorial sea would not alter this analysis

forcing this conclusion is the Supreme Court's treatment of the Antiquities Act in *United States v. California*, 436 U.S. 32 (1978). In that case, the Court resolved a dispute between the United States and California concerning who had dominion over submerged lands and water within a national monument established in 1949 within a one-mile belt off of the California coast. Although the Court ultimately held that Congress, through the SLA, had conveyed the United States's interest in the submerged lands to California, it noted along the way that: "There can be no serious question . . . that the President in 1949 had power under the Antiquities Act to reserve the submerged lands and waters within the one-mile belts as a national monument, since they were then 'controlled by the Government of the United States.'" *Id.* at 36.

The question, then, is whether this analysis applies in the 3–12 mile range as a result of President Reagan's 1988 proclamation extending the territorial sea to twelve miles. Critical to answering this question is determining the significance of the disclaimer in the proclamation providing that it does not "exten[d] or otherwise alte[r] existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom." There are two possible ways to interpret this disclaimer. One interpretation would be that the disclaimer prevents the proclamation from affecting the scope of any statute in any way in the absence of Congressional legislation adopting the proclamation as part of domestic law.[7] A second

---

The Antiquities Act only requires that the Government exert "contro[l]" over the area. Nothing in the language of the statute requires that the Government maintain absolute control over the area without exceptions The best reading of the statute, on the contrary, is that it requires only some significant quantum of control, which is easily satisfied within the territorial sea *See United States v California*, 436 U S at 36 The regulations and other laws that apply within the monument, however, if they are to comport with customary international law, would have to be subject to the international law right of innocent passage, although international law also allows coastal states to regulate innocent passage for particular purposes, including to prevent pollution, Restatement Third § 513(2)(b), and to conserve the living resources of the sea, *id.* § 513 cmt c(iv) Nothing in the Antiquities Act prohibits the President from establishing a monument subject to preexisting easements and reservations, and indeed previous monuments have been subject to such reservations. *See, e.g*, Proclamation No 7295, 65 Fed Reg 24,095, 24,098 (2000) (establishing Giant Sequoia National Monument and providing that "[n]othing in this proclamation shall be deemed to revoke any existing withdrawal, reservation, or appropriation" and that "[n]othing in this proclamation shall be deemed to affect existing special use authorizations"), Proclamation No 3443, 3 C F R 152, 153 (1961) (establishing Buck Island Reef National Monument and providing that no instrumentality of the United States "shall adopt or attempt to enforce any rule . . restricting or reducing the existing fishing . . bathing or recreational privileges by inhabitants of the Virgin Islands").

[7] A variety of Congressional statements express this view *See, e g*, H R Rep No 105–236, at 21 (1997) (expressing view that "while the President has the authority to expand our territory and sovereignty, only Congress has the authority to exercise legislative jurisdiction" and noting that unamended laws had been enforced only to the three mile limit); 137 Cong. Rec. 33,702, 33,702 (1991) (statement of Congressman Walter B. Jones) ("The Presidential proclamation explicitly provides that the extension of the territorial sea to 12 miles does not alter existing State or Federal law. In other words, the United States has a 12-mile territorial sea in the eyes of the rest of the world, but until Congress amends Federal laws to conform to the extended territorial sea, existing authorities only apply within the former 3-mile territorial sea This disclaimer means that Congress has the responsibility of completing what the President could only begin. If the United States is to have a meaningful 12-mile territorial sea, it must have the statutory authority to enforce its laws in the extended maritime zone. Only Congress can amend U S laws to accomplish this "). Representatives of the executive branch have also occasionally expressed this view *See Territorial Sea Extension, Hearing Before the Subcomm. on Oceanography and Great Lakes of the House Comm on Merchant Marine and Fisheries*, 101st Cong. 142 (1989) (statement of Rear Admiral Joseph E Vorbach, Chief Counsel, U.S.C.G.) ("[T]he Coast Guard's statutory authorities have not been changed by the Proclamation. Accordingly, the definitions and application of jurisdictional terms relied on by the Coast Guard to carry out its missions,

Continued

interpretation would be that, as a result of the disclaimer, the proclamation, acting alone, does not extend the reach of a statute unless Congress intended that the statute be linked to the extent of the territorial sea as that area may be defined at any given time. This latter interpretation is strongly supported by our 1988 opinion, which, although it was issued in anticipation of the proclamation, and therefore did not analyze the precise language of the proclamation, nonetheless assumed that, "[b]y its terms, the proclamation will make clear that it is not intended to affect domestic law." OLC Territorial Sea Opinion at 253. Our opinion observed that because "Congress may . . . have enacted statutes that are intended to be linked to the extent of the United States' territorial sea under international law," the proclamation might change the reach of some statutes. *Id.* "The issue . . . in determining the effect of the proclamation on domestic law," we observed, "is whether Congress intended for the jurisdiction of any existing statute to include an expanded territorial sea." *Id.* We further explained that the "most important consideration in determining whether Congress intended a statute to be affected by a change in the breadth of the territorial sea is the language of the statute." *Id.* We continued:

> If a statute includes a provision that simply overlaps or coincides with the existing territorial sea — such as the provision "three miles seaward from the coast of the United States" — the operation of the statute will probably not, in the absence of special circumstances, be affected by a change in the territorial sea. Indeed, the statute does not appear to invoke the concept of the territorial sea at all, except for denoting an area that coincides with the territorial sea. A similar case is presented by a statute that uses the term "territorial sea" but then defines it as "three miles seaward from the coast of the United States." Although the statute refers to the territorial sea, the definition reveals that Congress understood the area involved as the three-mile territorial sea in existence when the statute was enacted.
>
> Of course the more difficult cases will arise where Congress has used more ambiguous language. The best example is a statute which refers to the term "territorial sea" without further defining it. Congress could have intended the term to refer to the three miles that history and existing practice had defined or Congress could have intended the statute's jurisdiction to always track the extent of the United States' assertion of territorial sea under international law.

which have traditionally been applied to the previous territorial sea limit of 3 nautical miles, have not changed To fully enforce these statutes between 3 and 12 nautical miles, Congressional action is necessary to extend such federal laws beyond 3 nautical miles.")

> A determination of congressional intent in these circumstances will
> therefore require further inquiry into the purpose and structure of
> a particular statute, and may include reference to the legislative his-
> tory, the interpretation of the statute by the executive branch and
> the courts, and the meaning of similar statutes governing the same
> subject matter.

*Id.* at 253–54. Thus, our 1988 opinion took the position that the proclamation
would, with respect to some statutes, have domestic legal consequences and set
forth an analytic approach for determining which statutes would be affected by
the proclamation.

Although that opinion is not directly controlling here because it did not analyze
the specific language of the proclamation, a recent decision of the Second Circuit
Court of Appeals has analyzed that specific language and has explicitly adopted
the analysis of our opinion in its interpretation of the disclaimer. *In re Air Crash
off Long Island*, 209 F.3d 200 (2d Cir. 2000). In that case, the court considered
whether the Death on the High Seas Act ("DOHSA"), which provides for a right
of action to redress a death "caused by wrongful act . . . occurring on the high
seas beyond a marine league from the shore of any State," 46 U.S.C. § 761 (1994),
but which does not allow plaintiffs to recover nonpecuniary damages, applied to
a crash that occurred approximately eight miles off the coast of the United States.
Both parties agreed that, had the crash occurred before the 1988 proclamation
had been issued, the crash would have occurred beyond United States territorial
waters so that DOHSA would apply to bar plaintiffs from recovering nonpecuniary
damages. 209 F.3d at 212. "The issue, therefore, [was] whether after issuance
of the Proclamation, DOHSA applied to the waters between three and 12 miles
from the shore." *Id.* Defendants pointed to the disclaimer to argue that the
proclamation did not affect the scope of DOHSA, but the Second Circuit, quoting
our 1988 opinion, disagreed. *Id.* at 213. Instead, it held, "the impact of the
Proclamation must be assessed on a statute-by-statute basis." *Id.* Analyzing the
background and legislative history of DOHSA, the court concluded that Congress
had intended "to exclude all state and federal territorial waters from its scope."
*Id.* It continued:

> Nothing in DOHSA's history or purpose provides a persuasive rea-
> son to fix immutably the scope of the statute to the boundary
> between United States territorial waters and nonterritorial waters
> as it existed in [the year of the statute's enactment]. Thus, plaintiffs
> are correct in concluding that the effect of the Proclamation is to
> move the starting point of the application of DOHSA from three
> to 12 miles from the coast. Plaintiff's interpretation of the
> Proclamation does not change DOHSA, but designates certain addi-

tional waters to which DOHSA does not apply. If Congress in 1920 had included a definition of "high seas" as "waters outside United States or state territorial waters, where no nation is sovereign," as we believe it essentially did, the Proclamation would not change this definition. Indeed, if the Proclamation is construed to create a zone of federal territorial waters subject to DOHSA, then this would violate the disclaimer. DOHSA would effectively be amended by excluding federal territorial waters up to three miles from its coverage, but including federal territorial waters between three and 12 miles. Such an effect would be inconsistent with Congress's intent to exclude all federal territorial waters from the scope of DOHSA.

*Id.* at 213–14. Although it is unclear whether or not the dissent also reflects the view that our analytic framework was legally determinative,[8] the dissent employed that framework and found that in light of the specific language and legislative history of the Act, DOHSA applied in the disputed zone. *Id.* at 219–20 (Sotomayor, J., dissenting) (noting that OLC's analytical framework "comports with the classical canons of statutory construction").[9]

---

[8] The dissent's view of the effect of the disclaimer is unclear On the one hand, it says that "[b]ecause the Proclamation expressly states that it does not 'alter' any 'rights, legal interests or obligations' under federal law, an expansion of the U.S territorial sea for international law purposes should not alter the breadth of the territorial seas for domestic purposes," 209 F.3d at 217 (Sotomayor, J, dissenting), which would seem to suggest that the proclamation, standing alone, could have no effect on the reach of any domestic statute On the other hand, only a few pages later, the dissent adopts the analytical framework of our 1988 opinion and proceeds to apply it to DOHSA *See id* at 220 In any event, the dissenting opinion does not cause us to alter our view that the 1998 proclamation has domestic legal effects with respect to particular statutes.

[9] A handful of other cases that have considered the effect of the disclaimer have reached results that are somewhat in tension with the Second Circuit's decision in *In re Air Crash off Long Island* For example, in *Francis v. Hornbeck Offshore (1991) Corp*, 1997 WL 20740 (E D La. 1997), a two paragraph unpublished decision, a district court in Louisiana held that DOHSA did not apply to an accident occurring eight nautical miles from the coastline, noting that "Proclamation 5928, by its own terms, does not alter DOHSA's application beyond one marine league from shore." *Id* at *1. This one sentence treatment of the disclaimer's effect, however, is, in our view, not as persuasive or authoritative as the Second Circuit's reasoned decision. Likewise, in *Blome v. Aerospatiale Helicopter Corp*, 924 F Supp 805 (S D Tex 1996), *aff'd*, 114 F.3d 1184 (5th Cir 1997) (unpublished summary opinion), a district court in Texas concluded "that the only natural interpretation of DOHSA is that the statute applies to deaths occurring more than one marine league from shore unless the death occurred in state territorial waters " *Id* at 812 In other words, the court found that DOHSA could apply to waters within twelve miles from shore But the holding of the case was simply that DOHSA does not apply to deaths occurring in state territorial waters, and any observation the court made regarding the geographical scope of DOHSA was dicta Finally, in *United States v. One Big Six Wheel*, 166 F 3d 498 (2d Cir. 1999), the Second Circuit held that a provision in the Antiterrorism and Effective Death Penalty Act ("AEDPA") defining territorial waters as extending out to twelve miles for purposes of AEDPA jurisdiction did not affect the reach of the Gambling Ship Act, which effectively defined territorial waters as extending only to three miles The court noted that the AEDPA provision "references Presidential Proclamation 5928, [but that the] . . . Proclamation explicitly limits its application by declaring that 'nothing in this Proclamation . . . extends or otherwise alters existing Federal or State law '" *Id* at 501. But *One Big Six Wheel*, as *In re Air Crash off Long Island* notes, *see* 209 F 2d at 212, is consistent with *In re Air Crash off Long Island*, because the court rested its decision on an analysis of the intent of Congress as expressed through the specific language of the Gambling Ship Act. The court concluded "There is no indication that Congress now intends to prohibit shipboard casinos to the full extent of the nation's territorial reach.    [T]he term 'territorial waters' used [in the Gambling Ship Act] is not coextensive with the extent of the nation's criminal jurisdiction, rather, it specifies geographically where a certain kind of offshore gambling is a criminal activity and where it is licit. However one expands the territory

The Second Circuit's analysis is persuasive. In light of its opinion, we believe it is appropriate to apply the analytical framework of our 1988 opinion to determine whether the Antiquities Act applies in the 3–12 mile range. Analyzing the language of the statute, we think that Congress intended for the reach of the Antiquities Act to extend to any area that at the particular time the monument is being established is in fact "owned or controlled" by the U.S. Government, even if it means that the area covered by the Act might change over time as new lands and areas become subject to the sovereignty of the nation. As our 1988 opinion indicates, the particularly difficult cases arise when statutes are ambiguous as to whether they are linked to a specific and fixed geographic area or instead to a potentially fluctuating area defined by the range and extent of U.S. sovereignty, dominion, or authority. Unlike the hypothetical examples we considered in our 1988 opinion, the Antiquities Act is not at all ambiguous as to this point. It refers neither to the "territorial sea" nor to an area that coincides with the original three mile territorial sea. Instead, it simply refers to all lands "owned or controlled" by the U.S. Government. Because the reach of the Antiquities Act extends to lands "controlled" by the U.S. Government, its reach changes as the U.S. Government's control changes.[10] One example that supports this interpretation of the Act is President Kennedy's designation of the Buck Island Reef National Monument in the U.S. Virgin Islands, an area that was not part of the United States or its territories in 1906, when Congress passed the Antiquities Act.[11] Although the establishment of the Buck Island monument does not directly resolve the issue presented to us here — the monument was established within 3 miles of the baseline and before the 1988 proclamation — it does stand for the underlying principle that when the United States gains control over lands and areas that it did not control in 1906, that land is nonetheless covered by the Antiquities Act. Furthermore, the purpose of the Act — to authorize the President to take action to protect the nation's objects of historic and scientific interest, *see* S. Rep. No. 59–3797, at 1 (1906) (noting that the preservation of historic and prehistoric ruins and monuments on the public lands of the United States is "of great importance") — is consistent with the notion that the President should be able to take such an action in any area that is under U.S. Government control. Therefore, based

---

in which one's conduct might be proscribed     that territorial expansion does not criminalize offshore gambling that the Gambling Ship Act itself does not forbid " 166 F.3d at 502.

[10] We also note that our conclusion, discussed below, that President Reagan's proclamation extending the EEZ to 200 miles gives the President authority to establish a national monument under the Antiquities Act to protect marine resources in the EEZ is an independent source of authority for establishing a national monument in the territorial sea from 3–12 miles Prior to 1988, but after President Reagan extended the EEZ to 200 miles in 1983, the U.S. exerted as much control in the 3–12 mile zone as it currently does in the 12–200 mile zone. The extension of the territorial sea from three to twelve miles in 1988 could hardly be said to have decreased U.S control over the 3–12 mile region Thus, if the United States has sufficient control now over the EEZ for the President to establish a national monument there to protect marine resources, it necessarily follows that, regardless of the meaning of the disclaimer in the 1988 proclamation, the President has the authority to establish a national monument to protect marine resources in the 3–12 mile area

[11] Proclamation No 3443, 3 C F.R. 152 (1959–1963)

on the language and purpose of the Antiquities Act, as well as the administrative practice under that Act, we conclude that the President can establish a national monument under the Antiquities Act within the territorial sea from 3–12 miles seaward from the baseline.

The Fifth Circuit's decision in *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330 (5th Cir. 1978), is not to the contrary. In that case, the court considered whether the remains of a Spanish Galleon located on the outer continental shelf beyond the territorial sea were on lands "owned or controlled" by the Government for purposes of the Antiquities Act. The court rejected the argument that the Outer Continental Shelf Lands Act, 16 U.S.C. §§ 1331–1333 (1994 & Supp. IV 1998) (in relevant part) (authorizing U.S. Government control over mineral resources on the outer continental shelf) ("OCSLA"), gave the Government control over those lands for purposes of the Antiquities Act. The Court there observed, "an extension of jurisdiction for purposes of controlling the exploitation of the natural resources of the continental shelf is not necessarily an extension of sovereignty." 569 F.2d at 339. The case, however, was decided before President Reagan extended the territorial sea to twelve miles, and its analysis regarding the OCSLA is inapposite because, unlike the extension of the territorial sea, which gave the Government near total sovereign control over the sea up to twelve miles seaward of baseline, the OCSLA gave the Government control only over mineral resources, which is unrelated to control over historic objects like the shipwreck at issue in the case. *Treasure Salvors* did not consider the situation like the one at issue here, in which the President, through an executive proclamation, has given the U.S. near complete sovereignty over the area in question. Indeed, the decision was based on the premise that there had not been such an extension of sovereignty. *Id.*

The Department of Commerce, through NOAA, has argued that, because the United States does not own the territorial sea in the traditional property sense, but instead holds it in public trust for its citizens, Congress does not have power under the Property Clause of the Constitution, U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."), to authorize the President through the Antiquities Act to establish a national monument in that area. Letter for Randolph Moss, Acting Assistant Attorney General, Office of Legal Counsel, from James Dorskind, General Counsel, National Oceanic and Atmospheric Administration (July 24, 2000) ("NOAA Letter"). We believe, however, that Congress does have such authority under the Constitution. To begin with, we are not convinced that the Property Clause provides the only source of authority for Congress to make such an authorization; the Foreign Commerce Clause, which authorizes Congress to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, the Interstate Commerce Clause, which authorizes Congress to regulate commerce "among the

192

several States," *id.*, and the Admiralty Clause, U.S. Const. art. III, § 2,[12] might also confer this authority upon Congress. Moreover, NOAA's position would appear to be inconsistent with the Court's language in *United States v. California* recognizing the President's authority to establish a monument in the territorial sea. Indeed, on at least one occasion, the President has exercised his authority under the Antiquities Act to create a monument in the territorial sea — the Buck Island Reef National Monument in the U.S. Virgin Islands. NOAA's position would call this long-standing monument designation into question. What is decisive, however, is the fact that the Supreme Court has held that the Property Clause authorizes Congress to dispose of lands within the territorial sea. *See Alabama v. Texas*, 347 U.S. 272, 273–74 (1954) (per curiam). Although the public trust doctrine, which the Court did not address in *Alabama*, might limit in some ways the extent of the Government's control over the territorial sea,[13] the Government nonetheless maintains ample room under the doctrine to exercise dominion over that area to protect it and its resources for public enjoyment. Moreover, the creation of a national monument to protect living marine resources would be consistent with the Government's role as public trustee. *See, e.g., Matthews v. Bay Head Improvement Ass'n*, 471 A.2d 355, 360–65 (N.J. 1984) (explaining that the "public trust" doctrine, which holds that tidal waters are held for the public by the sovereign in public trust, ensures that the public will have "reasonable enjoyment" of the sea). In our view, then, because the territorial sea is subject to the sovereignty of the United States, Congress may regulate it under the Property Clause.

---

[12] *See In re Garnett*, 141 U.S. 1, 12 (1891) (holding that Congress's power to make amendments to the maritime law of the country "is not confined to the boundaries or class of subjects which limit and characterize the power to regulate commerce; but, in maritime matters, it extends to all matters and places to which the maritime law extends"); Grant Gilmore & Charles L Black, Jr., *The Law of Admiralty* 47 (2d ed. 1975) ("A second inference . . from the conferring of the judicial power in admiralty cases was to the effect that Congress thereby was empowered to alter and supplement the general maritime law. Many statutes — some of great importance — have been passed in the exercise of this power. None, apparently, has ever been declared unconstitutional Some have added to the judicial jurisdiction; some have changed or filled out substantive rules of maritime law; a few have added whole new chapters of law to the corpus."), *see also id* at 31 (noting that the high seas are "[o]bviously" included in maritime jurisdiction)

[13] It is not entirely clear whether and how the public trust doctrine applies to federally controlled waters. *Compare United States v 1 58 Acres*, 523 F. Supp 120, 124–25 (D. Mass. 1981) (finding that federal government's control over land below the low water mark was restricted by public trust duties) *with United States v 11 037 Acres*, 685 F Supp 214, 216–17 (N.D. Cal. 1988) (deciding that tidal land condemned in eminent domain proceedings by United States was no longer subject to state public trust easement). If the doctrine does apply in the territorial sea, it would place some limits on the federal government's control over that area For example, the public trust doctrine might place some limits on conveying submerged lands subject to the doctrine outright to private individuals or entities. *See* Andrea Marston, *Aquaculture and the Public Trust Doctrine· Accommodating Competing Uses of Coastal Waters in New England*, 21 Vt L. Rev 335, 343–44 (1996) (summarizing public trust doctrine as it is generally applied by the states), *In re Sanborn*, 562 P.2d 771, 776 (Haw 1977) (noting that ownership of land held in public trust "may not be relinquished, except where relinquishment is consistent with certain public purposes"). Moreover, the sovereign must take actions to protect the area held in public trust and to manage it for the public benefit *See* Marston, *supra*, at 341 ("[T]oday, every state is obligated to preserve and protect the public trust waters for recognized trust uses.").

## B. The EEZ

The EEZ is "a belt of sea beyond the territorial sea that may not exceed 200 nautical miles from the baseline from which the breadth of the territorial sea is measured." Restatement Third § 511(d). The Restatement Third summarizes the international customary laws governing the EEZ: [14]

> § 514 Exclusive Economic Zone
>
> In the exclusive economic zone . . . :
>
> > (1) The coastal state has
> >
> > > (a) sovereign rights for the purpose of exploring, exploiting, conserving, and managing the natural resources of the sea-bed and subsoil and of the superjacent waters, and engaging in other activities for the economic exploration and exploitation of the zone, and
> > >
> > > (b) authority, subject to limitations, to regulate (i) the establishment and use of artificial islands, and of installations and structures for economic purposes; (ii) marine scientific research; and (iii) the protection of the marine environment.
> >
> > (2) All states enjoy, as on the high seas, the freedoms of navigation and overflight, freedom to lay submarine cables and pipelines, and the right to engage in other internationally lawful uses of the sea related to these freedoms, such as those associated with the operation of ships or aircraft.

*Id.* § 514.

---

[14] Although this section is based on the Law of the Sea Convention, which the United States has not ratified, the basic rules contained in the section (concerning the EEZ) have also become "effectively established as customary law" and are therefore binding as a matter of international law even on nations that are not party to the Convention *See* Restatement Third § 514 cmt a. Moreover, several Presidents, including President Clinton, have stated publicly that the United States should abide by general rules established in the Convention *See, e.g.,* S. Treaty Doc. 103–39, at III (Oct. 7, 1994) (President Clinton, upon submitting Convention to the Senate for its advice and consent to ratification, noting that "it has been the policy of the United States to act in a manner consistent with its provisions relating to traditional uses of the oceans and to encourage other countries to do likewise"), *Statement On United States Oceans Policy,* 1 Pub. Papers of Ronald Reagan 378–79 (Mar. 10, 1983) (President Reagan characterizing LOS Convention "provisions with respect to traditional uses of the oceans" as "generally confirm[ing] existing maritime law and practice and fairly balanc[ing] the interests of all states" and stating that "the United States is prepared to accept and act in accordance with the balance of interests relating to traditional uses of the oceans — such as navigation and overflight"). *See also The Paquete Habana,* 175 U.S. 677, 700 (1900) (customary international law constitutes U.S. domestic law in the absence of controlling executive or legislative action).

Under customary international law, coastal states may take certain actions to protect the marine environment in their EEZ. Comments to the Restatement explain that although coastal states do not have sovereignty over the EEZ, they do possess sovereign rights for specific purposes. *Id.* § 514 cmt. c. One of these purposes is the conservation of the "natural resources of the sea-bed and subsoil and of the superjacent waters." *Id.* § 514(1)(a); *see also* § 514 cmt. f ("The coastal state is obligated to ensure, through proper conservation and management measures, that living resources in the exclusive economic zone are not endangered by over-exploitation."). To further this purpose, coastal states possess the authority to protect the marine environment. *Id.* § 514(1)(b)(iii). The authority of coastal states to take actions to protect this environment, however, is limited by a variety of customary rules of international law. For example, as § 514(2) of the Restatement notes, states may navigate ships through, fly planes over, and install pipelines under the EEZs of other states. Moreover, coastal states may only enforce rules and regulations to protect the environment if those rules are consistent with international norms. As one comment explains: "These grants of power are further circumscribed by rules contained in Parts V, XII, and XIII of the Convention . . . . Among these are rules requiring coastal states to ensure that their laws and regulations for the prevention, reduction, and control of pollution from vessels conform and give effect to generally accepted international rules and standards, to adjust their enforcement measures to the gravity of the violation, and to impose only monetary penalties." *Id.* § 514 cmt. c; *see also* cmt. i (noting that a coastal state can enforce its own laws and regulations "adopted in accordance with applicable international rules and standards").

In 1983, President Reagan established the EEZ of the United States out to 200 miles. Proclamation No. 5030, 3 C.F.R. 22 (1984).[15] The proclamation claimed for the United States, "to the extent permitted by international law . . . sovereign rights for the purpose of exploring, exploiting, conserving and managing natural resources, both living and non-living, of the seabed and subsoil and the superjacent waters." *Id.* at 23. It further provided that, "[w]ithout prejudice to the sovereign rights and jurisdiction of the United States, the Exclusive Economic Zone remains an area beyond the territory and territorial sea of the United States in which all States enjoy the high seas freedoms of navigation, overflight, the laying of submarine cables and pipelines, and other internationally lawful uses of the sea." *Id.* In the statement accompanying the proclamation, President Reagan explained: "The Exclusive Economic Zone established today will also enable the United States to take limited additional steps to protect the marine environment. In this

---

[15] Prior to this proclamation, Congress, in the Fishery Conservation and Management Act (now the MSFCMA), asserted authority over the living resources of the Fishery Conservation Zone, which extended from the seaward boundary of the coastal states out to 200 miles, and continental shelf fishery resources beyond 200 miles. The MSFCMA was amended after the proclamation to change the term "Fishery Conservation Zone" to "exclusive economic zone." *See, e.g.,* 16 U.S.C. § 1801(b)(1) (stating congressional purpose to exercise "sovereign rights for the purposes of . . . managing all fish within the exclusive economic zone established by Presidential Proclamation 5030, dated March 10, 1983.")

connection, the United States will continue to work through the International Maritime Organization and other appropriate international organizations to develop uniform international measures for the protection of the marine environment while imposing no unreasonable burdens on commercial shipping." *Statement on United States Oceans Policy*, 1 Pub. Papers of Ronald Reagan at 379.

Although the question is closer than the previous question regarding the territorial sea, we believe that the quantum of U.S. "control" over the EEZ is sufficient to allow the President to establish a national monument in the EEZ under the Antiquities Act to protect the marine environment.[16] We reach this conclusion on the basis of a combination of two factors. First, under customary international law and the 1983 proclamation, the United States maintains a significant amount of overall authority to exercise restraining and directing influence over the EEZ. It possesses sovereign rights to explore, conserve, and manage the natural resources of the seabed and subsoil, and it may engage in activities for the economic exploration and exploitation of the EEZ. Restatement Third § 514(1)(a); Proclamation No. 5030. *See also* Proclamation No. 2667, 3 C.F.R. 67 (1943–1948) (President Truman proclaims that "the United States regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control"). It also has the authority, albeit subject to some limitations, to establish and use artificial islands, installations, and structures in the EEZ for economic purposes, and to protect the marine environment. Restatement Third § 514(b); Proclamation No. 5030. Finally, to the extent that the EEZ overlaps with the contiguous zone of the United States, which extends to 24 miles seaward of the baseline as a result of President Clinton's 1999 proclamation, *see* Proclamation No. 7219, 3 C.F.R. 98 (2000), the United States also may exercise "the control necessary to prevent infringement of its customs, fiscal, immigration, or sanitary laws and regulations within its territory or territorial sea, and to punish infringement of the above laws and regulations. . . ." *Id.*; *see also* Convention on the Territorial Sea and the Contiguous Zone, art. 24, 15 U.S.T. 1606 (entered into force Sept. 10, 1964) (treaty to which U.S. is a party allowing coastal states, "[i]n a zone of the high seas contiguous to its territorial sea" to "exercise the control necessary to: (a) Prevent infringement of its customs, fiscal, immigration or sanitary regulations within its territory or territorial sea; [and] (b) Punish infringement of the above regulations committed within its territory or territorial sea."). The United States, in sum, exerts greater restraining and directing influence

---

[16] This does not necessarily mean, however, that the Antiquities Act would allow the President to establish a national monument to protect other types of objects or interests that the United States does not have sovereign rights over in the EEZ under customary international law The State Department has argued that even if the United States "controls" the EEZ for purposes of regulating natural resources, and can therefore establish a national monument to protect such resources, it does not "control" the EEZ for purposes of regulating non-natural resources, and could not establish a monument for those purposes State Memo at 1–2 We express no view as to whether the President could establish a monument to protect non-natural resources such as historic shipwrecks.

over the EEZ than any other sovereign entity, and that influence, as an overall matter, is extensive.

Second, the United States possesses substantial authority under international law to regulate the EEZ for the purpose of protecting the marine environment. This is true under customary international law, *see* Restatement Third § 514(b)(iii), the 1983 proclamation, *see* Proclamation No. 5030, and the Law of the Sea Convention,[17] which appears not only to allow the United States to take action to protect marine resources, but also to require some such actions. For example, the Convention requires coastal states to "promote the objective of optimum utilization of the living resources in the exclusive economic zone," art. 62(1), "determine the allowable catch of the living resources in its exclusive economic zone," art. 61(1), "ensure through proper conservation and management measures that the maintenance of the living resources in the exclusive economic zone is not endangered by over-exploitation," art. 61(2), and manage both anadromous and catadromous species of fish in the EEZ, arts. 66–67. Moreover, the Convention provides that nothing in the part of the convention governing the EEZ "restricts the right of a coastal State . . . to prohibit, limit or regulate the exploitation of marine mammals more strictly than provided for" in that part. Art. 65. Finally, the Convention provides that coastal states shall take "all measures consistent with this Convention that are necessary to prevent, reduce and control pollution of the marine environment from any source," art. 194(1), and those measures "necessary to protect and preserve rare or fragile ecosystems as well as the habitat of depleted, threatened or endangered species and other forms of marine life," art.194(5). In our view, although a close question. the authority the United States possesses under international law to protect the marine environment in the EEZ, in combination with the overall amount of restraining and directing influence that the United States exerts in the EEZ, *see supra*, give the United States sufficient "control" over the EEZ for the President to invoke the Antiquities Act for the purposes of protecting the marine environment.[18]

As it does with respect to the territorial sea, NOAA also claims that Congress does not possess authority under the Property Clause to authorize the President, through the Antiquities Act, to establish a national monument in the EEZ because the EEZ does not belong to the United States in the traditional property sense. Although the question is closer than the question regarding the territorial sea, we believe that Congress does possess such authority. As discussed previously, we think that the Property Clause is not the only relevant source of Congressional authority — both the Commerce Clause (foreign and interstate) and the Admiralty

---

[17] The United States has recognized that it should generally abide by the rules established in the Convention. *See supra* note 14

[18] For the same reasons, we believe that *Treasure Salvors*, which was decided before President Reagan extended the EEZ to 200 miles, does not govern this question. Unlike the OCSLA, which gave the U S sovereign rights only over mineral rights on the Outer Continental Shelf, the extension of the EEZ gave the U.S. certain sovereign rights over the marine environment as well Unlike the OCSLA, then, the extension of the EEZ gave the U.S. "control" over that area for purposes of establishing a national monument to protect marine resources

Clause may give Congress sufficient power to authorize the President to establish a monument in the EEZ. In any event, we believe that the Property Clause provides the requisite source of constitutional authority. Congress's power under the Property Clause is not limited to making rules and regulations to govern property that the Government owns in fee simple. The Property Clause authorizes Congress to take actions to protect and govern some lesser property interests as well. For example, in 1957, Attorney General Brownell issued an opinion finding that the Property Clause gave Congress the power to make needful rules and regulations regarding an option to revert title included in a deed conveyed to Milwaukee, Wisconsin that could be exercised if the conveyed land were ever alienated, because such a right was a "future interest and a species of property." *Waiver of Option of United States to Revert Title to Land in Event of Alienation*, 41 Op. Att'y Gen. 311, 312–13 (1957).[19] Although the operative phrase of the Property Clause — "belonging to" — may connote a stronger property interest than the word "control," which is used in the Antiquities Act, we believe that the significant amount of control and sovereign rights that the United States possesses over the EEZ are sufficient to authorize Congress to make rules and regulations governing the EEZ, at least with respect to protecting marine resources. First, the sovereign rights possessed by the United States in the EEZ are more substantial than the contingent future interest that was found to be sufficient for Property Clause purposes in the Attorney General's 1957 opinion; indeed, the "sovereign rights for . . . exploiting, conserving, and managing" possessed by the United States constitute a property interest of great scope and significance. Moreover, as the D.C. Circuit has held, the Property Clause applies to property essentially held in trust by the government for private parties, *Arizona v. Bowsher*, 935 F.2d 332, 334–35 (D.C. Cir. 1991) (finding that Property Clause applies to moneys held by the Department of Treasury even though individuals with unknown whereabouts held claims against the United States in amounts exactly matching the funds), and the "sovereign rights for . . . conserving [ ] and managing" reflect a similar authority to control property for purposes of stewardship. *Cf. United States v. Louisiana*, 339 U.S. 699, 705 (1950) (after holding that U.S. has

---

[19] *See also United States v Brown*, 384 F.Supp 1151, 1157 (E.D. Mich. 1974) ("[F]or the Property Clause to be properly invoked as a basis for congressional enactment, some actual and substantial property interest of the federal government must be involved "), *rev'd on other grounds*, 557 F 2d 541 (6th Cir 1977), *United States v. Davis*, 872 F. Supp 1475 (E D. Va. 1995) (adopting *Brown's* Property Clause analysis), *aff'd*, 98 F.3d 141 (4th Cir. 1996) *Cf. Cappaert*, 426 U S at 138 (Property Clause empowers United States to reserve unappropriated appurtenant water when it reserves land for a federal purpose to the extent needed to accomplish the purpose of the reservation), *Federal "Non-Reserved" Water Rights*, 6 Op O L C 328, 346 (1982) ("It is now settled that when the federal government reserves land for a particular federal purpose, it also reserves, by implication, enough unappropriated water as is reasonably necessary to accomplish the purposes for which Congress authorized the land to be reserved . . ."). We recognize, however, that the Property Clause may not authorize Congress to make needful rules and regulations to govern objects and areas over which it has only a very limited property interest. *See, e g., Prize German Vessel Allocated to United States Transferred to Canada*, 41 Op Att'y Gen. 41, 43 (1949) (Property Clause does not apply when United States holds ship only as a bailee and when there is a "binding obligation upon the United States to transfer possession of and such title as it may have to the [ship] to the country to which it was finally allocated").

dominion in the three-mile belt of territorial sea, addressing claim that Louisiana claimed property interest in area outside that belt and saying: "If, as we held in California's case, the three-mile belt is in the domain of the Nation rather than that of the separate States, it follows a fortiori that the ocean beyond that limit also is.").

Although the President may establish a national monument in the EEZ, the rules and regulations that govern activities within that monument must nonetheless be consistent with recognized rules of international law,[20] some of which might allow activities otherwise prohibited in national monuments by Department of the Interior regulations or require the United States to take certain international actions before prohibiting certain conduct within the monument. Although we do not undertake here exhaustively to identify all such rules, we note that customary international law allows all states certain freedoms within the EEZs of other states, including the freedoms of navigation and overflight, and the right to lay submarine cables and pipelines. Moreover, the Law of the Sea Convention, the rules of which the United States generally abides by, *see supra* note 14, contains very specific rules regarding regulation of pollution from vessels of other states. For instance, the Convention provides that coastal states, "acting through the competent international organization or general diplomatic conference, shall establish international rules and standards to prevent, reduce and control pollution of the marine environment from vessels and promote the adoption, in the same manner, whenever appropriate, of routing systems designed to minimize the threat of accidents which might cause pollution of the marine environment." Art. 211(1).[21] The Convention also contains specific provisions governing the rights and powers of coastal states to enforce their laws and regulations. *See* Art. 220; Restatement Third § 514 cmt i. Therefore any designation of a national monument in the EEZ should specify

---

[20] President Reagan's proclamation establishing the EEZ explicitly provided that the United States would only exercise sovereign rights there "to the extent permitted by international law " Proclamation No 5030. We have assumed for purposes of this opinion that the President intends to act in conformity with President Reagan's proclamation when taking any action to protect the coral reef resources of the Northwest Hawaiian Islands

[21] In a section that appears particularly relevant to the issue of what international law limitations might apply to the establishment of rules and regulations applicable within the monument, the Convention continues·

> Where the international rules and standards referred to [in the just-quoted section] are inadequate to meet special circumstances and coastal States have reasonable grounds for believing that a particular, clearly defined area of their respective exclusive economic zones is an area where the adoption of special mandatory measures for the prevention of pollution from vessels is required for recognized technical reasons in relation to its oceanographical and ecological conditions, as well as its utilization or the protection of its resources and the particular character of its traffic, the coastal States, after appropriate consultations through the competent international organization with any other States concerned, may, for that area, direct a communication to that organization, submitting scientific and technical evidence in support and information on necessary reception facilities. Within 12 months after receiving such a communication, the organization shall determine whether the conditions in that area correspond to the requirements set out above If the organization so determines, the coastal States may, for that area, adopt laws and regulations for the prevention, reduction and control of pollution from vessels implementing such international rules and standards or navigational practices as are made applicable, through the organization, for special areas These laws and regulations shall not become applicable to foreign vessels until 15 months after the submission of the communication to the organization

Art 211(6)(a).

that only regulations and restrictions that are consistent with international law will apply within the monument.

## II. Establishing a National Wildlife Refuge

The Department of the Interior has argued that, in addition to establishing a national monument under the Antiquities Act, the President could also designate, in either the territorial sea or the EEZ, a national wildlife refuge that would be governed by the NWRSAA and regulations applicable to that Act. Because the NWRSAA does not itself contain a provision authorizing the President to withdraw land for a wildlife refuge, however, the Department of the Interior argues that the President could rely on the implied authority to reserve public lands recognized in *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915). In that case, President Taft, responding to a rapidly depleting supply of oil available to the federal government, issued a proclamation withdrawing several million acres of oil rich lands from private mineral entry pending legislation to keep the lands in federal ownership. The Supreme Court affirmed the President's implied power to withdraw public lands in the public interest without specific statutory authorization, relying on a long historical practice that Congress, through inaction, had affirmed through its acquiescence. As the Court said in connection with the 252 instances of Presidential withdrawal that it had identified:

> The Executive, as agent, was in charge of the public domain; by a multitude of orders extending over a long period of time, and affecting vast bodies of land, in many States and Territories, he withdrew large areas in the public interest. These orders were known to Congress, as principal, and in not a single instance was the act of the agent disapproved. Its acquiescence all the more readily operated as an implied grant of power in view of the fact that its exercise was not only useful to the public, but did not interfere with any vested right of the citizen.

*Id.* at 475.

As the Department of the Interior also recognizes, however, the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701–1784 (1994 & Supp. IV 1998) ("FLPMA"), enacted in 1976, provides that "[e]ffective on and after the date of approval of this Act, the implied authority of the President to make withdrawals and reservations resulting from acquiescence of the Congress (U.S. v. Midwest Oil Co., 236 U.S. 459) . . . [is] repealed." FLPMA § 704(a), 90 Stat. at 2792. The plain language of this statute would appear to preclude the President from relying on the authority of *Midwest Oil* to establish a national wildlife refuge. To support its view that such authority is still available to the President, the

Department of the Interior points to the definition section of the FLPMA, which provides that the term "public lands" means "any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management . . . except — (1) lands located on the Outer Continental Shelf." 43 U.S.C. § 1702(e). This provision, along with the history leading up to the enactment of the FLPMA,[22] the Department of the Interior argues, indicates that the repeal of the *Midwest Oil* authority extends only to withdrawals of lands that are not on the Outer Continental Shelf and would therefore not preclude the President from using this authority to withdraw lands for a national wildlife refuge in either the territorial sea or the EEZ.

The Department of the Interior also argues that the relationship between the executive and legislative branches regarding public land withdrawals "reflects a continuing dialogue" and that the FLPMA's purported repeal of the *Midwest Oil* power "does not mean the Presidential authority is completely dead." For this latter point, the Department of the Interior points to the fact that after Congress passed the Pickett Act in 1910,[23] which authorized the President to make temporary withdrawals for public purposes (subject to private mining exploration and purchase), Presidents continued to make permanent withdrawals based on the *Midwest Oil* power, Attorney General Jackson issued an opinion upholding this practice,[24] and at least one court affirmed the President's power to make such withdrawals, *Portland General Electric Co. v. Kleppe*, 441 F. Supp. 859, 861–62 (D. Wyo. 1977). The Department further cites what it refers to as the "leading public land law treatise," which, pointing to the Pickett Act/*Kleppe* example, says: "[T]he implied executive withdrawal power did not arise from affirmative legislation; it arose from congressional inaction in the face of executive action. It logically follows that the nonstatutory power is not subject to simple repeal. Instead, it would seem regenerable and effective against private benefit seekers until Congress objects to its exercise." 2 George Cameron Coggins & Robert L. Glicksman, *Public Natural Resources Law* § 10D.03[2][b] (2000).

Based on the materials submitted to us, we are unconvinced that the President has the authority to establish or expand a wildlife refuge within the U.S. territorial sea or the EEZ using the presidential authority recognized in *Midwest Oil*.[25]

---

[22] The FLPMA's withdrawal provisions, we are told by the Department of the Interior, grew out of a study done for the Public Land Law Review Commission by Charles Wheatley. Neither this study nor the Commission's subsequent report, we have been further informed, appears to have devoted any attention to withdrawals of areas in marine waters. The Commission's report led directly to the enactment of the FLPMA. According to the Department of the Interior, this history indicates that "[t]here is no evidence that Congress was concerned at all with executive branch withdrawals in marine waters when it sought to repeal the implied authority of the President upheld in *Midwest Oil* in the Federal Land Policy and Management Act." *See* Memorandum for William Treanor & Jay Wexler, Office of Legal Counsel, from John D Leshy, Solicitor, Department of the Interior 1 (Aug. 11, 2000)

[23] June 25, 1910, ch. 421, 36 Stat 847 (repealed by FLPMA)

[24] *Withdrawal of Public Lands*, 40 Op. Att'y Gen 73, 77 (1941)

[25] We express no view, however, on whether the President could establish a national wildlife refuge for national defense or foreign affairs purposes Such an action might be justified as an exercise of the President's constitutional authority, as opposed to implied authority rooted in practice To our knowledge, no defense or foreign affairs rationale

Continued

Although it does appear that Congress was not concerned with the territorial sea or the EEZ when it enacted FLPMA, the section repealing the *Midwest Oil* power contains no exceptions, and the most natural reading of that section is that Congress intended to restrict the President's withdrawal authority to only that authority specifically provided by statute. The Department of the Interior's position would, in effect, read the phrase "public lands," defined by the Act to exclude lands located on the Outer Continental Shelf, into § 704(a). That section, however, does not include that phrase, but instead appears to cover all possible withdrawals. Moreover, the legislative history of FLPMA supports the view that Congress intended to repeal all implied withdrawal power. *See* H.R. Rep. No. 94–1163, at 29 (1976) ("The main authority used by the Executive to make withdrawals is the 'implied' authority of the President recognized by the Supreme Court in *U.S. v. Midwest Oil Co.* (236 U.S. 459). The bill would repeal this authority and, with certain exceptions, all identified withdrawal authority granted to the President or the Secretary of the Interior."); H.R. Conf. Rep. No. 94–1724, at 66 (1976) ("The House amendments (but not the Senate bill) provided for the repeal of practically all existing executive withdrawal authority. The conferees agreed to this repeal to the extent provided for by the House."). Given the plain language of the statute, we think it likely that a court would find that § 704(a) of the FLPMA prohibits the President from relying on the implied *Midwest Oil* authority to withdraw lands, regardless of where those lands are located.

Moreover, while it may be the case that the history of executive withdrawal of public lands has taken place as part of a dialogue with Congress, we do not think this history makes it clear that the President may continue to make *Midwest Oil* withdrawals in the territorial sea or EEZ following the enactment of FLPMA. First, the current situation is distinguishable from the situation addressed in Attorney General Jackson's 1941 opinion and in *Kleppe*. There, Congress had enacted a law that specifically authorized the President to make temporary withdrawals, and the question was whether that law implicitly repealed the President's authority under *Midwest Oil* to make permanent withdrawals. The Attorney General opinion, in upholding the President's authority to make permanent withdrawals, said that: "All that the act of 1910 expressly does is to authorize such temporary withdrawals, subject to certain limitations. It expressly negatives no power possessed by the President." 40 Op. Att'y Gen. at 77. Here, by contrast, the question is whether Congress's clear language repealing the *Midwest Power* really means what it seems to mean, and, unlike in the case of the Pickett Act, here Congress has indeed "expressly negativ[ed]" a power previously possessed by the President. In light of this difference, we do not think the President could properly rely on the 1941 Attorney General opinion or *Kleppe* to withdraw lands

has been put forward as a justification for the potential national wildlife refuge in the Northwest Hawaiian Islands. We also express no view as to whether the President possesses statutory authority under the OCSLA to set aside areas for the protection of fish and wildlife resources.

pursuant to *Midwest Oil*.[26] Second, although a pattern or practice of executive withdrawals of lands in the territorial sea or EEZ made pursuant to the implied *Midwest Oil* power following the enactment of FLPMA might indicate Congressional acquiescence to such withdrawals and might provide a basis for justifying the continued assertion of the *Midwest Oil* power in those areas, we have been told by the Department of the Interior that no such practice exists.[27]

### III. Management Issues

### A. Management of National Monuments

We have been asked a number of questions relating to how a national monument in the territorial sea or the EEZ could lawfully be managed. The first set of issues is whether management for a monument established in either the territorial sea or the EEZ could be delegated to an agency other than the Department of the Interior and whether management for such a monument could be shared between the Department of the Interior and another agency. The short answer is as follows: The President may delegate management responsibilities for such a monument to an agency other than the Department of the Interior if that agency has some independent statutory authority to manage the relevant resource, but the Department of the Interior must maintain concurrent management of the monument. Management for such a monument can generally be shared between the Department of the Interior and another agency, but if the monument overlays a national wildlife refuge area, the Fish and Wildlife Service ("FWS") of the Department of the Interior must maintain sole management authority over the part of the monument that is also a refuge area.

Although the Antiquities Act does not itself restrict the President's ability to delegate management of a national monument to whichever agency he deems appropriate, current law does require that the Department of the Interior maintain management authority over all national monuments. Acting under a 1933 statute that authorized the President to reorganize the Government, see Title IV, Act of

---

[26] The Department of the Interior points out that on at least one occasion it has relied upon its interpretation of FLPMA to transfer jurisdiction over offshore submerged lands from one Interior agency to another without going through the procedurally elaborate withdrawal provisions of § 204 of FLPMA Memorandum for William Treanor & Jay Wexler, Office of Legal Counsel, from John Leshy, Solicitor, Department of the Interior (Aug. 14, 2000) Our conclusion regarding the continuing effectiveness of the *Midwest Oil* power, however, turns solely on our interpretation of the specific language and legislative history of § 704(a) of FLPMA and should not be read to affect how the Department of the Interior may interpret § 204 of that Act.

[27] We have been told that Presidents have established several national wildlife refuges encompassing oceanic waters *See* Joint Memo, attached Coral Reefs Background Paper at 5 (describing the establishment of the Yukon Delta National Wildlife Refuge in 1929, the Hawaiian Islands National Wildlife Refuge in 1909, and the Midway Atoll National Wildlife Refuge in 1903). NOAA, on the other hand, claims that "[r]efuge jurisdiction over submerged lands and marine resources in some existing refuges is also unclear, at best " NOAA Letter at 2. The answer to the question posed to us does not turn on which of these accounts is correct, however, because none of the information we have received from the interested agencies indicates that the President has attempted to rely on the *Midwest Oil* power to withdraw submerged lands following the enactment of FLPMA

March 3, 1933, ch. 212, 47 Stat. 1489, 1517, amended by Title III, Act of March 20, 1933, ch. 3, 48 Stat. 8, 16, President Roosevelt issued a reorganization plan providing in part that: "All functions of administration of . . . national monuments . . . are consolidated in the National Park Service in the Department of the Interior . . .; except that where deemed desirable there may be excluded from this provision any public building or reservation which is chiefly employed as a facility in the work of a particular agency." Exec. Order No. 6166, *reprinted in* 5 U.S.C. § 901 note (1994). Congress subsequently ratified this reorganization plan in 1984. Act of Oct. 19, 1984, Pub. L. No. 98–532, 98 Stat. 2705.[28] Although Executive Order No. 6166 requires that administration of national monuments be consolidated in the National Park Service ("NPS"), the Secretary of the Interior may exercise his authority under Reorg. Plan No. 3 of 1950, 3 C.F.R. § 1003 (1950), 43 U.S.C. § 1451 note (1970), 64 Stat. 1262 (1950), also ratified by Congress in 1984, which permits him to authorize the performance of any function of a Department officer, agency, or employee by any other officer, agency, or employee of the Department, to redesignate NPS's authority over the monument to any other agency within the Department, including the FWS. Letter for Thomas Lambrix, Domestic Policy Council, from Larry A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel (Aug. 30, 1979) ("Although the Park Service is vested by Executive Order No. 6166 with the authority to administer monuments, the Secretary of the Interior, under Reorganization Plan No. 3 of 1950 . . . has discretionary authority to transfer the functions of administering monuments elsewhere within his Department.").

We have previously opined that nothing in Executive Order No. 6166 precludes the President from designating an agency other than the Department of the Interior as a management authority for a national monument, so long as the Department of the Interior has a concurrent role in management and so long as the other agency has some independent statutory authority to manage the relevant resource.

---

[28] This Act provided: "Section 1 The Congress hereby ratifies and affirms as law each reorganization plan that has, prior to the date of enactment of this Act, been implemented pursuant to the provisions of chapter 9 of title 5, United States Code, or any predecessor Federal reorganization statute Sec. 2. Any actions taken prior to the date of enactment of this Act pursuant to a reorganization plan that is ratified and affirmed by section 1 shall be considered to have been taken pursuant to a reorganization expressly approved by Act of Congress." The legislative history of this Act indicates Congress was concerned that certain reorganization plans had been promulgated pursuant to statutes that contained legislative veto provisions invalidated by *INS v. Chadha,* 462 U S 919 (1983), and wanted to "ensure that the authority of agencies affected by past reorganization plans is not disrupted," H R. Rep. No. 98–1104, at 4426 (1984). Although the 1933 statute that provided the President authority to issue Executive Order No. 6166 did not contain a legislative veto provision, nothing in the plain language of the statute limits its application to reorganization plans issued pursuant to unconstitutional statutes, and it would seem anomalous for Congress to have decided to ratify as law only those reorganization plans that were in effect illegal, while not ratifying those that were issued pursuant to constitutional statutes We therefore disagree with the suggestion of the Congressional Research Service that the 1984 Act might not have in fact ratified as law the 1933 executive order. *See* Pamela Baldwin, Congressional Research Service, *Legal Issues Raised by the Designation of the Grand Staircase-Escalante National Monument* 14 (Dec. 13, 1996) (arguing that because the 1933 statute did not suffer from a *Chadha* problem, the "1933 E O. and associated reorganization were not defective and did not need to be ratified as law by Congress in the 1984 Act" and that therefore "arguably, the consolidation of management of national monuments in the NPS was and is wholly an executive act, and may not need a subsequent act of Congress to change the consolidation of management in NPS").

*See Management of Admiralty Island and Misty Fiords National Monuments*, 4B Op. O.L.C. 396 (1980) ("Hammond Memo"). In a dispute that arose after the designation of national monuments on national forest lands, we explained that because neither the designation of a national monument under the Antiquities Act nor Executive Order No. 6166 expunged the national forest status of the underlying lands, the Department of Agriculture was not legally barred from helping to administer those lands through that Department's Forest Service, the agency responsible for the management of national forest lands. *Id.* at 398. We further concluded that under Executive Order No. 6166, the NPS was also "authorized to participate in the management of these monuments." *Id.* at 399. In light of the fact that both agencies possessed appropriate authority, we approved of a plan for the two agencies to "enter into a memorandum of understanding to govern the management of these monuments, accounting for the land use standards binding on the departments and specifying each department's regulatory and budgetary responsibilities." *Id.* We have subsequently approved for legality several national monument proclamations authorizing agencies other than the Department of the Interior to assume primary management authority but requiring those agencies to consult with the Secretary of the Interior when developing management plans and regulations to govern the monument. *See, e.g.*, Proclamation No. 7295, 65 Fed. Reg. 24,095, 24,098 (2000) (establishing Giant Sequoia National Monument, authorizing Secretary of Agriculture to manage national monument on national forest lands, and requiring the Secretary of Agriculture to consult with the Secretary of the Interior when "developing any management plans and any management rules and regulations governing the monument").[29] Although no precise rules have been developed to govern how management authority must be allocated between the Department of the Interior and other managing agencies, the administrative practice discussed above requires that the Department of the Interior be consulted on all significant management decisions relating to the national monument and have the opportunity to bring any issue upon which it disagrees with the other managing agency or agencies to the President or his delegee for resolution.

Next, we were asked whether it would affect the President's management options if the monument encompassed a portion of the coral reef ecosystem currently within the Northwest Hawaiian Islands National Wildlife Refuge. We conclude that the President's options would be limited in such a situation because the NWRSAA requires that the FWS maintain sole and exclusive management authority over all national wildlife refuge areas. Although the plain language of the statute does not itself expressly mandate such exclusive management — the statute only says that all refuge areas "shall be administered by the Secretary through the United States Fish and Wildlife Service," 16 U.S.C. § 668dd(a)(1) (Supp. IV 1998) — the legislative history of the amendments to the Act adding

---

[29] Our office reviews all executive orders and proclamations for form and legality. *See* 28 C F.R. § 0.25(b) (1999)

this language and subsequent court decisions make clear that exclusive jurisdiction is required. As the legislative history indicates, the amendments to the Act were intended to redress the existing problem of dual management over refuge areas, which the Senate thought undermined protection of fish and wildlife resources in those areas. S. Rep. No. 94–593, at 2 (1976) (noting that "[j]oint jurisdiction over [refuge] areas has been a source of difficulty for both [FWS and the Bureau of Land Management], and it has long been felt that there should be a resolution to the problem"); *id.* (quoting several reports noting problems with split adminis-tration of refuge areas); *id.* at 5 (explaining rejection of House version which would have allowed "unworkable" dual administration of refuge areas). The Senate Report accompanying the bill amending the Act specifically explained, in language that could hardly be clearer, that dual administration of refuge areas would be prohibited by the Act:

> Subsection (a)(1) of the bill would amend the first sentence of sec-tion 4(a) of the Administration Act by adding a new provision that would require all units of the system to be administered by the Secretary of the Interior through the U.S. Fish and Wildlife Service. This will address two problems that have been brought to the Committee's attention. First, the Fish and Wildlife Service would be clearly designated as the agency through which the Secretary would be required to administer the units of the System, thereby eliminating the possibility of the Secretary delegating this authority to the Bureau of Land Management or any other Interior agency. Second, *there will be no joint administration of any units within the System by the U.S. Fish and Wildlife Service and any other agency.*

*Id.* at 6 (emphasis added). Relying on this legislative history, a district court in Alaska, in a decision summarily affirmed by the Ninth Circuit, held that the Department of the Interior could not designate lead management responsibility over a national wildlife refuge area to the U.S. Geological Survey. *Trustees for Alaska v. Watt,* 524 F. Supp. 1303, 1308–10 (D. Alaska 1981) ("Joint administra-tion over the Refuge is forbidden by Congress."), *aff'd,* 690 F.2d 1279 (9th Cir. 1982) (per curiam); *see also Wyoming v. United States,* 61 F. Supp.2d 1209, 1220 (D. Wyo. 1999) (analyzing text of the NWRSAA and concluding that "it is evi-dent that Congress left little room for any other entity to exert management control over national refuges"). In light of this legislative history and case law, we believe that if a monument encompasses a wildlife refuge area, the part of the monument that is also a refuge area would have to be managed exclusively by FWS and that the Secretary of the Interior would not be able later to transfer such manage-ment authority over that area to any other agency within the Department of the

Interior.[30] The rest of the monument could be managed by FWS, NPS, or a combination of either of these two agencies and an agency outside of the Department of the Interior which has some statutory authority for managing the relevant resources.

## B. Effect of the MSFCMA on Establishment and Management of National Monuments

The next set of management questions posed to us regards the effect of the MSFCMA on the potential establishment and management of a national monument in the EEZ. We were asked whether the fact that such a monument may encompass a portion of the coral reef ecosystem that is subject to fishery management under the MSFCMA would have any bearing on management issues or whether it would have any effect on the President's authority to establish the monument. The fact that such a monument would encompass an area subject to fishery management under the MSFCMA would not have any bearing on whether the President could establish a monument there. Such an overlap would, however, have some bearing on which agencies the President could designate to manage the monument to the extent that in such overlapping areas NOAA would have independent statutory authority to manage fishery resources and could therefore be designated as a management authority for that region for the purposes of conserving fishery resources consistent with the MSFCMA.

The Antiquities Act provides only that the President may designate a national monument on any lands "owned or controlled by the Government of the United States." 16 U.S.C. § 431 (1994). Nothing in that Act precludes the President from declaring a national monument on lands that are currently managed by an agency under any other statute or applicable law. Nor have we found any provision in the MSFCMA that would preclude the President from designating a monument in waters administered under that statute. Moreover, this Office has several times approved for legality proclamations designating monuments on lands already reserved under other statutes for management by agencies other than the Department of the Interior. *See, e.g.,* Hammond Memo (monument on national forest lands); Proclamation No. 7319, 65 Fed. Reg. 37,253 (2000) (establishing Hanford Reach National Monument on lands managed by the Department of Energy); Proclamation No. 7295, 65 Fed. Reg. 24,095 (2000) (establishing Giant Sequoia National Monument on national forest lands). Therefore, the fact that the Depart-

---

[30] With respect to transferring management of a refuge from FWS to another agency within the Department of the Interior, the Reorganization Act of 1950, in our view, would be trumped by the more specific amendments to the NWRSAA, which prohibit such a transfer. We do not believe the same can be said, however, of the 1984 Act ratifying Executive Order No 6166, which requires the NPS to administer all national monuments. The language of Executive Order No. 6166 does not provide for exclusive NPS jurisdiction over national monuments, and we are aware of no legislative history, analogous to the relevant legislative history of the NWRSAA, which would indicate an intention on the part of President Roosevelt or the Congress to require such exclusive jurisdiction over national monuments

ment of Commerce might be authorized by statute to manage fishery resources in the area to be designated as a national monument does not prohibit the President's designation of that area as a monument under the Antiquities Act.

Resolution of the management question requires consideration of the specific provisions of the MSFCMA. That Act establishes a national program to conserve and manage the nation's fishery resources and habitats. Section 101(a) of the Act provides that the United States "claims, and will exercise in the manner provided for in this chapter, sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone." 16 U.S.C. § 1811(a). The Act establishes eight regional Fishery Management Councils that are required to develop fishery management plans to manage and conserve fishery resources. *Id.* §§ 1851, 1852, 1853(a). The plans are submitted to the Secretary of Commerce for approval. *Id.* § 1854(a). The Secretary of Commerce may also, in certain specified situations, develop his own fishery management plans. *Id.* § 1854(c). Fishery management plans, we are told by NOAA, can incorporate a wide range of fishery management measures, including time and area closures, size and bag limits, gear restrictions, permit requirements, or the establishment of marine reserves where all fishing is prohibited. NOAA Letter at 6. The Act provides that all fishery management plans must be consistent with "national standards, . . . regulations implementing recommendations by international organizations in which the United States participates . . . and any other applicable law," *id.* § 1853(a)(1)(c), and that the Secretary of Commerce must review all plans to determine "whether [they are] consistent with the national standards, the other provisions of this chapter, and any other applicable law," *id.* § 1854(a)(1)(A).

Because the MSFCMA only gives the Department of Commerce the authority to manage one type of activity — namely fishery conservation — in certain areas, rather than giving it general management authority over those areas, and because the Act provides that the fishery management plans developed or approved by the Secretary of Commerce must be consistent with other applicable laws, there would not seem to be any inherent management conflicts between the MSFCMA and a monument established under the Antiquities Act. The President could give general management authority over the monument to the Department of the Interior, and the Department of Commerce would continue to approve and develop fishery management plans for the relevant area consistent with other laws applicable to the area covered by the national monument, including regulations that apply to land under the jurisdiction of the Department of the Interior and any specific measures set out in the proclamation designating the monument. Alternatively, for areas of the monument that do not overlap a refuge area but do overlap areas managed by the Department of Commerce under the MSFCMA, the President could provide in the proclamation that the Department of Commerce will share management authority for those portions of the monument with the

Department of the Interior with respect to fishery-related activities,[31] so long as the Department of the Interior maintains at least consultation authority with respect to all significant management decisions.

Next, we were asked whether regulations made applicable to a national monument take precedence over inconsistent MSFCMA regulations. Because the MSFCMA provides that fishery management plans must be consistent with "any other applicable law," we think that monument regulations would take precedence over inconsistent fishery management plans developed pursuant to the MSFCMA, unless the regulations provide otherwise. NOAA argues that the "other applicable law" language in the MSFCMA applies only to "other laws for preparing and implementing fishery regulations." [32] Letter for William Treanor, Deputy Assistant Attorney General, Office of Legal Counsel, from James A. Dorskind, General Counsel, NOAA at 4 (Aug. 14, 2000). In our view, however, the language of MSFCMA — which specifically refers to "*any* other applicable law," is not limited to certain types of laws but is instead comprehensive in scope and would apply to any other law applicable in the area governed by the Act, including regulations applicable to national monuments. The legislative history of the Act confirms that fishery management plans must be consistent with all other applicable laws.[33] Moreover, case law from the Ninth Circuit and elsewhere indicates that the "any other applicable law" language of the MSFCMA is broad in scope and encompasses both procedural and substantive laws.[34] We do not address, however, the extent to which the President could fashion the monument proclamation to allow the development of fishery management plans that would provide for taking

---

[31] We do not address whether the Department of Commerce may draw upon its statutory authority under the NMSA to manage a national monument with respect to activities that are not related to fishery management.

[32] NOAA also argues that the MSFCMA provides that fishery management authority within the EEZ shall be exercised "in the manner provided for in" that Act . On this basis, it argues that the Secretary of Commerce has exclusive authority to manage fish in the EEZ NOAA Letter at 5–7 But that exclusive authority is subject to the terms of the Act itself, which provides that all fishery management plans must be consistent with other applicable laws. Moreover, the Department of Commerce contends that because the Antiquities Act does not apply in the EEZ, it does not constitute an "other applicable law" for purposes of the MSFCMA. *Id* at 7. But our answer to this question assumes that the Antiquities Act does apply in the EEZ, if it does not, then the President could not establish a monument there in the first instance, and management issues would not even arise

[33] *See, e.g*, S. Rep. No. 94–711, at 40 (1976) ("The Secretary's review shall be designed to determine whether the fishery management plan is consistent with the national standards for fishery conservation and management, the other provisions and requirements of this legislation and *any* other applicable law " (emphasis added)); S Rep. No 94–416, at 37 (1975) ("Once a council completes its plans and recommended regulations and submits them to the Secretary, the Secretary would review the regulations and determine whether they are consistent (1) with the national standards, and (2) with the provisions and requirements of this Act and *any* other applicable law " (emphasis added)), H.R. Rep. No 94–948, at 40 (1976) ("The Secretary's review shall be designed to determine whether the fishery management plan is consistent with . . *any* other applicable law." (emphasis added))

[34] *See, e g , Parravano v. Babbitt*, 70 F 3d 539, 544 (9th Cir. 1995) ("Indian fishing rights that exist under federal law may constitute 'any other applicable law '"); *id* at 547 ("When the [fishery management] councils' recommendations threaten conservation goals or undermine other federal laws and obligations, the Secretary must reject them."), *Washington State Charterboat Ass'n v Baldrige*, 702 F 2d 820, 823 (9th Cir 1983) (holding that treaties negotiated between the United States and several Pacific Indian tribes in the 1850s establishing the rights of treaty fishers constituted "other applicable law" under the MSFCMA), *Greenpeace v. National Marine Fisheries Serv.*, 80 F Supp.2d 1137, 1144 n 7 (W D Wash. 2000) (noting that the National Marine Fisheries Service had admitted to the court that fishery management plans must comply with the Endangered Species Act under "any other applicable law" provision of MSFCMA)

of some fish within the monument or refuge by providing, for example, that any regulations pertaining to the monument would have to be consistent with the fishery plans developed under the MSFCMA.

## C. Effect of Establishment of a National Monument on the Secretary of Commerce's Authority to Establish a National Marine Sanctuary under the NMSA

Finally, we were asked whether regulations applicable to a national monument would preclude the establishment of a marine sanctuary under the NMSA or would take precedence over regulations issued under the NMSA. The NMSA authorizes the Secretary of Commerce to:

> designate any discrete area of the marine environment as a national marine sanctuary and promulgate regulations implementing the designation if the Secretary — (1) determines that the designation will fulfill the purposes and policies of this chapter and (2) finds that (A) the area is of special national significance due to its resource or human-use values; (B) existing state and Federal authorities are inadequate or should be supplemented to ensure coordinated and comprehensive conservation and management of the area, including resource protection, scientific research, and public education; (C) designation of the area as a national marine sanctuary will facilitate the objectives in subparagraph (B); and (D) the area is of a size and nature that will permit comprehensive and coordinated conservation and management.

16 U.S.C. § 1433(a). The Secretary is required to consider various factors when determining whether a proposed sanctuary meets these standards, *id.* § 1433(b), and must follow a detailed process for designation and promulgation of applicable regulations, *id.* § 1434. The Act makes it unlawful for anyone to destroy or injure sanctuary resources. *Id.* § 1436.

The existence of regulations applicable to a monument would not preclude establishment of a marine sanctuary under the NMSA. Indeed, the Act specifically envisions that other regulatory schemes could be applicable to the area sought to be designated as a sanctuary. For example, the Act lists as one of its purposes the need "to provide authority for comprehensive and coordinated conservation and management of these marine areas, and activities affecting them, in a manner that complements *existing regulatory authorities.*" *Id.* § 1431(b)(2) (emphasis added). The existence of other regulatory schemes, however, might limit the discretion of the Secretary of Commerce to designate a marine sanctuary because the NMSA allows the Secretary to designate such a sanctuary only if existing

federal authorities are "inadequate or should be supplemented." *Id.* § 1433(a)(2)(B). The Secretary of Commerce would therefore have to consider whether the designation of the relevant area as a monument sufficiently protected the marine resources in question, and could only designate the area as a marine sanctuary if he found that such a designation was insufficient to protect those resources or that the regulations applicable to the monument should be supplemented to protect those resources. On the other hand, that very limitation also suggests an intent on the part of Congress that NMSA regulations that are more stringent with respect to protecting marine resources would in fact trump other relevant regulations, such as monument regulations, that are not so stringent. The purpose of the NMSA would appear to be to allow the Secretary of Commerce the authority to provide more protection to marine areas than is already provided by other regulatory regimes.

## IV. Conclusion

We have concluded that the President may establish a national monument pursuant to the Antiquities Act in both the territorial sea and the EEZ. We are unconvinced, however, that the President would have the authority to establish a national wildlife refuge in either the territorial sea or the EEZ using the implied power of *Midwest Oil*. With respect to management issues, we find that authority to manage monuments can, under certain circumstances, be shared between the Department of the Interior and other agencies, that the FWS must maintain sole management authority over any national wildlife refuge area within a monument, that regulations applicable to national monuments trump inconsistent fishery management plans, and that the establishment of a national monument would not preclude the establishment of a national marine sanctuary in the same area.

RANDOLPH D. MOSS
*Assistant Attorney General*
*Office of Legal Counsel*