**TRUSTEES FOR ALASKA, et al., Plaintiffs,**

v.

**James G. WATT, Secretary of the Interior, et al., Defendants.**

**No. A81–264 Civ.**

United States District Court,
D. Alaska.

Nov. 2, 1981.

Robert E. Mintz, Trustees for Alaska, Anchorage, Alaska, for plaintiffs.

Michael Spaan, U. S. Atty. for Alaska, Anchorage, Alaska, Cynthia L. Pickering, Atty., U. S. Dept. of Justice, Land and Natural Resources Division, Anchorage, Alaska, Carol E. Dinkins, Asst. Atty. Gen., Land & Natural Resources Division, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

THIS CAUSE comes before the court on cross motions for summary judgment. The court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

## I. BACKGROUND

During the second session of the Ninety-fourth Congress, the National Wildlife Refuge System Administration Act of 1966 (Wildlife Refuge Administration Act), 16 U.S.C. §§ 668dd–668ee (1976), was amended to provide that the Refuge System "shall be administered by the Secretary [of Interior] through the United States Fish and Wildlife Service." *Id.* § 668dd(a)(1). Congress thereby made clear that the goals of the National Wildlife Refuge System would best be served "by assuring that the U. S. Fish and Wildlife Service has responsibility for management in all areas of the refuge

system." S.Rep.No.94–593, 94th Cong., 2nd Sess. 5, *reprinted in* [1976] U.S.Code Cong. & Ad.News 288, 292 [hereinafter Wildlife Refuge System Report].

The Arctic National Wildlife Refuge (Refuge), established on 6 December 1960, is part of the National Wildlife Refuge System. The Refuge, composed of tundra, mountains, and tiaga forest, encompasses an area from the Brooks Range north to the Beaufort Sea, with a coastal plain stretching 130 miles from the Canadian border to the Canning River. Southward, the forested foothills and valleys of the Refuge extend to the northern drainage of the Yukon River. The Refuge provides a wilderness habitat for various wildlife representing a continuum of major Arctic wildlife.

During the second session of the Ninety-sixth Congress, the Alaska National Interest Lands Conservation Act of 1980 (ANILCA), 16 U.S.C. §§ 3101–3233 (1980 Supp.), was enacted. ANILCA designated approximately 105 million acres of federal land in Alaska for protection of its resource values through permanent federal ownership and management. S.Rep.No.96–413, 96th Cong., 2nd Sess. 126, *reprinted in* [1980] U.S. Code Cong. & Ad.News 5070, 5071 [hereinafter ANILCA Report]. In regard to the National Wildlife Refuge System, ANILCA more than doubled its size; set out specific rules for refuge management;

and directed a special gas and exploration study program for the Arctic National Wildlife Refuge. *Id.* 5071–72.

Specifically, § 303(2)(B)(i) of ANILCA provides that one of the main "purposes for which the Arctic National Wildlife Refuge is established and shall be managed . . . [is] to conserve fish and wildlife populations and habitats in their natural diversity . . . ." Section 304(a) asserts that each refuge "shall be administered by the Secretary . . . in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act." Alaska National Interest Lands Conservation Act of 1980, Pub.L.No.96–487, Tit. III, 94 Stat. 2371, 2384 (1980) (Title III of ANILCA is not codified).

Title X of ANILCA established a study program for federal lands on Alaska's north slope. Pursuant to the study program the Secretary of the Interior is authorized to allow oil and gas exploration in the Arctic National Wildlife Refuge. 16 U.S.C. § 3142(a).[1]

Section 3142(c) directs the Secretary to conduct a baseline study of fish and wildlife in the Refuge, which must be published within eighteen months of enactment.[2] Within two years of enactment, the Secretary shall establish regulations on the initial guidelines for oil and gas exploration. AN-

---

1. 16 U.S.C. § 3142(a) provides:

The purpose of this section is to provide for a comprehensive and continuing inventory and assessment of the fish and wildlife resources of the coastal plain of the Arctic National Wildlife Refuge; an analysis of the impacts of oil and gas exploration, development, and production, and to authorize exploratory activity within the coastal plain in a manner that avoids significant adverse effects on the fish and wildlife and other resources.

2. 16 U.S.C. § 3142(c) provides:

The Secretary, in consultation with the Governor of the State, Native Village and Regional Corporations, and the North Slope Borough within the study area and interested persons, shall conduct a continuing study of the fish and wildlife (with special emphasis on caribou, wolves, wolverines, grizzly bears, migratory waterfowl, musk oxen, and polar bears) of the coastal plain and their habitat. In conducting the study, the Secretary shall—

(A) assess the size, range, and distribution of the populations of the fish and wildlife;
(B) determine the extent, location and carrying capacity of the habitats of the fish and wildlife;
(C) assess the impacts of human activities and natural processes on the fish and wildlife and their habitats;
(D) analyze the potential impacts of oil and gas exploration, development, and production on such wildlife and habitats; and
(E) analyze the potential effects of such activities on the culture and lifestyle (including subsistence) of affected Native and other people. Within eighteen months after the enactment of this Act, the Secretary shall publish the results of the study as of that date and shall thereafter publish such revisions thereto as are appropriate as new information is obtained.

ILCA § 3142(d).[3] The guidelines must be based on the baseline study results; must include restrictions necessary to protect fish and wildlife; and must be accompanied with an environmental impact statement on exploratory activities. *Id.* Thereafter, any person, including USGS, may submit an exploration plan for the Secretary's approval. *Id.* § 3142(e).[4] Five years following enactment, the Secretary must report on oil and gas exploration results, and the effect further exploration and development would have on fish and wildlife. *Id.* § 3142(h).[5]

**3.** 16 U.S.C. § 3142(d) provides:

(1) Within two years after the enactment date of this Act, the Secretary shall by regulation establish initial guidelines governing the carrying out of exploratory activities. The guidelines shall be based upon the results of the study required under subsection (c) and such other information as may be available to the Secretary. The guidelines shall include such prohibitions, restrictions, and conditions on the carrying out of exploratory activities as the Secretary deems necessary or appropriate to ensure that exploratory activities do not significantly adversely affect the fish and wildlife, their habitats, or the environment, including, but not limited to—

(A) a prohibition on the carrying out of exploratory activity during caribou calving and immediate post-calving seasons or during any other period in which human activity may have adverse effects;

(B) temporary or permanent closing of appropriate areas to such activity;

(C) specification of the support facilities, equipment and related manpower that is appropriate in connection with exploratory activity; and

(D) requirements that exploratory activities be coordinated in such a manner as to avoid unnecessary duplication.

(2) The initial guidelines prescribed by the Secretary to implement this subsection shall be accompanied by an environmental impact statement on exploratory activities. The initial guidelines shall thereafter be revised to reflect changes made in the baseline study and other appropriate information made available to the Secretary.

**4.** 16 U.S.C. § 3142(e) provides:

(1) After the initial guidelines are prescribed under subsection (d), any person including the United States Geological Survey may submit one or more plans for exploratory activity (hereinafter in this section referred to as "exploration plans") to the Secretary for approval. An exploration plan must set forth such information as the Secretary may require in order to determine whether the plan is consistent with the guidelines, including, but not limited to—

(A) a description and schedule of the exploratory activity proposed to be undertaken;

(B) a description of the equipment, facilities, and related manpower that would be used in carrying out the activity;

(C) the area in which the activity would be undertaken; and

(D) a statement of the anticipated effects that the activity may have on fish and wildlife, their habitats and the environment.

(2) Upon receiving any exploration plan for approval, the Secretary shall promptly publish notice of the application and the text of the plan in the Federal Register and newspapers of general circulation in the State. The Secretary shall determine, within one hundred and twenty days after any plan is submitted for approval, if the plan is consistent with the guidelines established under subsection (d). If the Secretary determines that the plan is so consistent, he shall approve the plan: except that no plan shall be approved during the two-year period following the date of enactment of this Act. Before making the determination, the Secretary shall hold at least one public hearing in the State for purposes of receiving the comments and views of the public on the plan. The Secretary shall not approve of any plan submitted by the United States Geological Survey unless he determines that (1) no other person has submitted a plan for the area involved which meets established guidelines and (2) the information which would be obtained is needed to make an adequate report under subsection (h). The Secretary, as a condition of approval of any plan under this section—

(A) may require that such modifications be made to the plan as he considers necessary and appropriate to make it consistent with the guidelines;

(B) shall require that all data and information (including processed, analyzed and interpreted information) obtained as a result of carrying out the plan shall be submitted to the Secretary; and

(C) shall make such data and information available to the public except that any processed, analyzed and interpreted data or information shall be held confidential by the Secretary for a period of not less than two years following any lease sale including the area from which the information was obtained.

**5.** 16 U.S.C. § 3142(h) provides:

Not earlier than five years after the enactment date of this Act and not later than five years and nine months after such date, the Secretary shall prepare and submit to Congress a report containing—

(1) the identification by means other than drilling of exploratory wells of those areas within the coastal plain that have oil and gas production potential and estimate of the volume of the oil and gas concerned;

On 12 March 1981, Secretary of the Interior James Watt transferred lead responsibility for the Arctic National Wildlife Refuge report and exploration regulations from U. S. Fish and Wildlife Service (FWS) to U. S. Geological Survey (USGS). USGS thereby became the lead Interior agency for performance of § 3142(h) and (d) functions. Secretary Watt left FWS in charge of § 3142(c) baseline study requirements, and gave USGS responsibility for approving § 3142(e) exploration plans with FWS concurrence.

Plaintiffs have brought this action for declaratory and injunctive relief, claiming that Secretary Watt's transfer of § 3142(d) and (h) functions, and his assignment of responsibility for approving § 3142(e) plans to USGS with FWS concurrence, are in violation of the Refuge Act and ANILCA. Defendants contend that the Secretary's administration of § 3142 functions is entirely lawful and within the bounds of his discretion. Both parties agree that there is no genuine issue of fact, and that the case should be decided on cross motions for summary judgment.

■ The court notes that plaintiffs have standing to bring this action. Members of Trustees for Alaska, Fairbanks Environmental Center, Alaska Center for the Environment, as well as David Benton and Robert Childers, individually allege that they use the Arctic National Wildlife Refuge for recreation. The Village of Kaktovik, located within the Refuge, alleges that its residents use the wildlife resources of the Refuge for food, material, and cultural needs. These allegations establish a "distinct and palpable injury" traceable to the fact that delegation to USGS rather than FWS allegedly will lead to regulations allowing exploration without sufficient environmental safeguards. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978).

## II. JUDICIAL REVIEW

Judicial Review of the Secretary's action is governed by the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (1976). Section 702 allows judicial review of agency action when a person is "adversely affected or aggrieved by agency action …." The APA precludes judicial review only when there is a statutory prohibition on judicial review, or when agency action is committed by law to agency discretion. *Id.* § 701. In this case there is no statutory prohibition on review, and the narrow exception for action committed to agency discretion is inapplicable. *Cf. Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1970) (exception for agency discretion applicable only in rare cases when statute is so broad there is no law to apply).

■ In determining the standard for judicial review, the court must look to § 706 of the APA. *Cf. Citizens to Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823 ("generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry"). In this case the applicable subsections are § 706(2)(A) and (C), which require the Secretary's decision to be set aside if it was arbitrary, capricious, an abuse of discretion, not in accordance with law, or in excess of his statutory authority. In applying these subsections, the court must consider whether the Secretary based

(2) the description of the fish and wildlife, their habitats, and other resources that are within the areas identified under paragraph (1);

(3) an evaluation of the adverse effects that the carrying out of further exploration for, and the development and production of, oil and gas within such areas will have on the resources referred to in paragraph (2);

(4) a description of how such oil and gas, if produced within such area, may be transported to processing facilities;

(5) an evaluation of how such oil and gas relates to the national need for additional domestic sources of oil and gas; and

(6) the recommendations of the Secretary with respect to whether further exploration for, and the development and production of, oil and gas within the coastal plain should be permitted and, if so, what additional legal authority is necessary to ensure that the adverse effects of such activities on fish and wildlife, their habitats, and other resources are avoided or minimized.

his decision on all relevant factors, whether the decision involved a clear error of judgment, and whether the decision was beyond his statutory authority. *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823.

■ In reviewing the Secretary's decision, great weight must be given to his interpretation of the federal statutes involved. *Nance v. Environmental Protection Agency*, 645 F.2d 701, 714 (9th Cir. 1981). Nevertheless, the Secretary's interpretation of the statutes is neither infallible nor always controlling, and the court is the final authority on important questions of statutory construction. *Patagonia Corp. v. Board of Governors of the Federal Reserve System*, 517 F.2d 803, 812 (9th Cir. 1975). If there are compelling indications that the Secretary's interpretation of his delegation authority was wrong, there is no requirement that the court defer to his interpretation. *Id.*

## III. REVIEW OF THE SECRETARY'S DECISION

The statutory language of the Refuge Act shows that the National Wildlife Refuge System must be administered by the Secretary of Interior through FWS. 16 U.S.C. § 688dd(a)(1) (1976). "Absent a clearly expressed legislative intent to the contrary, [the statutory] language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Here clearly expressed statutory language is also well supported by the legislative history. Wildlife Refuge System Report, *reprinted in* [1976] U.S.Code Cong. & Ad.News 288, 293.

Since the Arctic National Wildlife Refuge must be "administered" by FWS, the question before the court is whether the § 3142(d), (e) and (h) ANILCA functions assigned to USGS involve administration of the Refuge. If the functions involve administration, the delegation is beyond the Secretary's statutory authority and invalid.

### A. *Wildlife Administration Defined*

Congress did not define what it meant by "administered" in the Refuge Act. The words of the statute coupled with the legislative history, however, demonstrate that Congress simply meant "administered" to have its common meaning. *Cf. Pettis ex rel. United States v. Morrison-Knudsen Co.*, 577 F.2d 668, 672 (9th Cir. 1978) (assume Congress "said what it meant and meant what it said"). "Administer," according to WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976) means: "to manage the affairs of . . . ." In the Refuge System Legislative History, the Senate report states "the U. S. Fish and Wildlife Service has responsibility for *management* in all areas of the refuge system." Refuge System Legislative History, *reprinted in* [1976] U.S.Code Cong. & Ad.News at 292 (emphasis added). This leads to the conclusion that Congress intended FWS to "manage" the refuge system.

"Manage," according to Webster means "to control and direct." Webster's Third New International Dictionary (1976). Manage is a lesser included term of administer. Accordingly, in administering the Arctic National Wildlife Refuge, Congress intended FWS to control and direct the affairs of the Refuge.

It remains to be determined, however, what FWS must do to comply with Congress's mandate that it administer or manage the Refuge. As two commentator's have recently expressed, "[t]here is no good definition of 'wildlife management,' and there is little agreement on what wildlife managers should do." G. Coggins and M. Ward, *The Law of Wildlife Management on The Federal Public Lands*, 60 Ore.L.Rev. 59, 59 (1981). Nevertheless, these commentators point out that wildlife management is concerned with the effect of human activities on wildlife, and the wildlife manager's job is to control human beings and institutions in order to protect the wildlife population. *Id.* at 68–69. The commentators conclude that: "Wildlife management is necessarily a means of regulating human access to a renewable natural resource in order to

preserve it for future generations." *Id.* at 70.

Although neither ANILCA nor the Wildlife Refuge Administration Act specifically address what wildlife administration entails, the legislative histories of both acts lead to the conclusion that wildlife management covers protection of wildlife and control of human access to the wildlife refuges. In addressing the management responsibilities of FWS the legislative history of ANILCA reasons: "[W]hile it is important to focus attention on the major species of each refuge, it is equally important that the Fish and Wildlife Service manage these units to conserve the entire spectrum of plant and animal life found on the refuge." ANILCA Report, *reprinted in* [1980] U.S.Code Cong. & Ad.News at 5118. The legislative history of the Wildlife Refuge Administration Act incorporates a wildlife management report which addresses control of human access to wildlife refuges for mineral exploration. The report concludes that access for mineral exploration must be controlled by FWS. Refuge System Legislative History, *reprinted in* [1976] U.S.Code Cong. & Ad.News at 289–90.

▮ From a review of the legislative histories of ANILCA and the Wildlife Refuge Administration Act; relevant statements of commentators on the management issue; and the definitions of "administer" and "management;" the court concludes that in administering the Arctic National Wildlife Refuge, FWS is required to control and direct the Refuge by regulating human access in order to conserve the entire spectrum of wildlife found in the Refuge.

B. *Whether the Secretary's Transfers to USGS are Invalid*

▮ If the § 3142(d) and (h) functions transferred to USGS (as well as the approval of § 3142(e) plans in which FWS must concur) involve the administration of the Refuge, the transfers are invalid; since transfer from FWS to USGS would be contrary to the refuge administration requirements of the Refuge Administration Act and ANILCA.

The § 3142(d) functions involve the establishment of initial guidelines, by regulation, for the conducting of exploration activities. The guidelines must "ensure that exploratory activities do not significantly adversely affect the fish and wildlife . . . ." 16 U.S.C. § 3142(d). Additionally, the guidelines must be accompanied by an environmental impact statement covering exploratory activities. *Id.* The subsection (d) guidelines involve controlling exploration activity in the Refuge to prevent an adverse effect on fish and wildlife. Subsection (d) addresses administration of the Refuge, which must be done by FWS.

Subsection (e) of § 3142 involves the submission of plans for exploration in the Refuge. The plans must be consistent with the subsection (d) guidelines to merit exploration approval. Subsection (e) is inextricably intertwined with subsection (d). If the exploration plans are inconsistent with the subsection (d) guidelines they cannot be approved. Subsection (d) is the passive phase of exploration—the drafting of exploration guidelines, while subsection (e) is the active phase—actual exploration pursuant to subsection (d). Approval of exploration in the Refuge manifestly involves controlling and directing human access to the Refuge. This must be done by FWS.

The fact that the Secretary's directive allowed FWS concurrence on the subsection (e) regulations does not alter the court's conclusion. The Refuge System Legislative History reveals that a major problem which the Refuge Act sought to solve was joint jurisdiction over the refuges. Refuge System Legislative History, *reprinted in* [1976] U.S.Code Cong. & Ad.News at 289. In explaining § 668dd(a)(1) of the Wildlife Refuge Administration Act, the legislative history affirms FWS is the designated agency through which the refuges must be administered, "thereby eliminating the possibility of the Secretary delegating his authority to . . . any other Interior agency." Further, "there will be no joint administration of any units within the System by the U. S. Fish and Wildlife Service and any other agency." *Id.* at 293. In giving USGS re-

sponsibility for approving exploration plans with FWS concurrence, the Secretary provided for joint administration. Joint administration over the Refuge is forbidden by Congress.

Subsection (h) of § 3142 is the final administrative stage in determining whether oil and gas development should be allowed in the Refuge. Pursuant to subsection (h), the Secretary must, within five years of ANILCA enactment, report to Congress on exploration results, the effect of exploration on fish and wildlife, and whether further exploration and development is warranted. *See* 16 U.S.C. § 3142(h)(1)–(5). If further exploration and development is warranted, the report must provide the additional legal authority "necessary to ensure that the adverse effects of such activities on fish and wildlife ... are avoided or minimized." *Id.* § 3142(h)(6). In essence, the report to Congress ensures that "development of the Range be made only with adequate information and the full participation of the Congress." ANILCA report, *reprinted in* [1980] U.S.Code Cong. & Ad. News at 5185. The agency within the Department of the Interior given the responsibility for the subsection (h) report supplies information essential to determining whether development activity will be permitted within the Refuge. This is a Refuge administration function, and the agency responsible for the subsection (h) report must be FWS.

From a review of the Refuge Act, ANILCA, and the legislative histories of both acts, the court holds that Secretary Watt's transfer of § 3142(d) and (h) functions from FWS to USGS, and his assignment to USGS of lead responsibility for approving § 3142(e) plans, was a clear error of judgment and beyond his statutory authority.

Accordingly, IT IS ORDERED:

1) THAT plaintiffs' motion for summary judgment is granted.

2) THAT defendants' motion for summary judgment is denied.

3) THAT plaintiffs' counsel prepare a proposed declaratory judgment in favor of plaintiffs declaring:

(1) Secretary of the Interior, James Watt's 12 March 1981 directive, "Transfer of Lead Agency Responsibilities for the Arctic National Wildlife Refuge Report and Exploration Regulations," is invalid, since it is in excess of statutory authority under the Alaska National Interest Lands Conservation Act and the National Wildlife Refuge System Administration Act.

(2) The Secretary of the Interior's responsibilities pursuant to § 1002(d), (e) and (h) of the Alaska National Interest Lands Conservation Act of 1980, must be delegated to the United States Fish and Wildlife Service.

4) THAT defendant James Watt re-assign and delegate to defendant Director of the U. S. Fish and Wildlife Service full responsibility for all of the requirements under § 1002(d), (e) and (h) of the Alaska National Interest Lands Conservation Act.