**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| AUDUBON SOCIETY OF PORTLAND, An Oregon nonprofit corporation; OREGON WILD, An Oregon nonprofit corporation; WATERWATCH OF OREGON, An Oregon nonprofit corporation, *Plaintiffs-Appellants*, <br><br> and <br><br> CENTER FOR BIOLOGICAL DIVERSITY; WESTERN WATERSHEDS PROJECT, *Plaintiffs*, <br><br> v. <br><br> DEB HAALAND, in her official capacity as Secretary of the United States Department of the Interior; AURELIA SKIPWITH, in her official capacity as Director of the United States Fish and Wildlife Service; UNITED STATES FISH AND WILDLIFE SERVICE, a federal agency of | No. 20-35508 <br><br> D.C. Nos. 1:17-cv-00069-CL 1:17-cv-00098-CL 1:17-cv-00468-CL 1:17-cv-00531-CL <br><br><br> OPINION |

the United States Department of the Interior,
*Defendants-Appellees*,

TULELAKE IRRIGATION DISTRICT; KLAMATH WATER USERS ASSOCIATION; TULELAKE GROWERS ASSOCIATION; TALLY HO FARMS PARTNERSHIP, DBA Walker Brothers; FOUR H ORGANICS, LLC; WOODHOUSE FARMING AND SEED COMPANY; MICHAEL BYRNE,
*Intervenor-Defendants-Appellees*.

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted October 5, 2021
Portland, Oregon

Filed July 18, 2022

Before:  William A. Fletcher, Sandra S. Ikuta, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge W. Fletcher

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's summary judgment to the U.S. Fish and Wildlife Service in an action brought by the Audubon Society of Portland ("ASP") alleging that a combined Environmental Impact Statement and Comprehensive Conservation Plan ("EIS/CCP") with respect to the Tule Lake and Lower Klamath Refuges in the Klamath Basin National Wildlife Refuge Complex violated various laws.

Two key statutes govern the Service's management of refuges in the Klamath Refuge Complex: the Kuchel Act of 1964, and the National Wildlife Refuge System Improvement Act, as amended by the Refuge Improvement Act.

The panel considered, and rejected, the four arguments ASP raised on appeal.

First, ASP argued that the failure of the Service under the EIS/CCP to provide sufficient water for the Lower Klamath Refuge violated the Refuge Act. The panel noted its sympathies to ASP's concerns because the water currently available for the Lower Klamath Refuge was inadequate to serve the purposes of the refuge. The panel held, however, it was satisfied on the record, given the constraints on the Service, whose ability to provide water was severely limited,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that the EIS/CCP fulfilled the Service's obligation under the Refuge Act.

Second, ASP argued that the EIS/CCP's continuation of the present pattern of agricultural leasing in the Tule Lake and Lower Klamath Refuges violated the Kuchel and Refuge Acts, and was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). ASP's core argument was that the EIS/CCP authorized an improper mix of agricultural land and natural habitat. The panel held that in the EIS/CCP, the Service considered the arguments made by ASP. Given the extensive evidence in the record supporting the choices made by the Service, the panel saw nothing that authorized it, as the reviewing court, to make different choices. The panel held that the balance struck by the EIS/CCP, with respect to the issues raised in the appeal, was consistent with the Kuchel and Refuge Acts, and with the APA.

Third, ASP argued that the EIS/CCP delegated administrative responsibilities to the Bureau of Reclamation in violation of the Refuge Act. The panel held that the Bureau's responsibilities under the EIS/CCP were not "administration" within the meaning of the Refuge Act's anti-delegation provision. The Bureau in this case was assigned specified management functions and was, in all respects, subject to the supervision and approval of the Service.

Fourth, ASP argued that the failure of the EIS/CCP to consider a reduced-agriculture alternative violated the National Environmental Policy Act ("NEPA"). The panel held that the Service sufficiently considered whether to reduce the acreage devoted to lease-land farming, and

sufficiently explained why it did not list such reduction as an alternative in the EIS/CCP.

The panel concluded that to the degree the present pattern of agricultural leasing in the Tule Lake and Lower Klamath Refuges was consistent with proper waterfowl management in those refuges, the Kuchel and Refuge Acts directed the Service to continue that present pattern of leasing.    In reviewing the EIS/CCP, the panel recognized constraints on the Service and deferred to reasoned explanations provided by the Service in support of its decisions.

## COUNSEL

Maura C. Fahey (argued) and Oliver J. H. Stiefel, Crag Law Center, Portland, Oregon, for Plaintiffs-Appellants.

Stephanie M. Parent (argued), Center for Biological Diversity, Portland, Oregon; Hannah M.M. Connor, Center for Biological Diversity, St. Petersburg, Florida; for Plaintiff Center for Biological Diversity.

John S. Persell (argued), Western Watersheds Project, Hailey, Idaho; David H. Becker, Law Office of David H. Becker, LLC, Portland, Oregon; Paul D. Ruprecht, Western Watersheds Project, Reno, Nevada; for Plaintiff Western Watersheds Project.

Andrew M. Bernie (argued), Andrew C. Mergen, and Ellen J. Durkee, Attorneys; Jean E. Williams, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Brittany K. Johnson (argued), Paul S. Simmons, and Alexis K. Stevens, Somach Simmons & Dunn, PC, Sacramento, California, for Intervenor-Defendants- Appellees.

Timothy Beau Ellis,Vial Fotheringham LLP, Lake Oswego, Oregon, for amici curiae Oregon Farm Bureau Federation, Klamath-Lake County Farm Bureau, California Farm Bureau Federation, Modoc County Farm Bureau, and Siskiyou County Farm Bureau.

## OPINION

W. FLETCHER, Circuit Judge:

In January 2017, the United States Fish and Wildlife Service ("Service") issued a Record of Decision ("ROD") adopting a combined Environmental Impact Statement and Comprehensive Conservation Plan ("EIS/CCP") for five of the six refuges in the Klamath Basin National Wildlife Refuge Complex ("Klamath Refuge Complex" or "Complex") in southern Oregon and northern California. This appeal is one of four consolidated appeals from a district court decision rejecting various challenges to the Service's action.

In the appeal now before us, the Audubon Society of Portland ("ASP") brought suit against the Service in the district court, arguing that the EIS/CCP violates the Kuchel Act of 1964 ("Kuchel Act"), the National Wildlife Refuge System Improvement Act as amended by the Refuge Improvement Act ("Refuge Act"), the Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA"), and the Clean Water Act ("CWA") with

respect to the Tule Lake and Lower Klamath Refuges in the Complex.  The district court granted summary judgment to the Service.

On appeal, ASP no longer argues that the EIS/CCP violates the CWA, but it continues to press its other arguments.  ASP argues that the EIS/CCP violates the Refuge Act because it fails to provide sufficient water for the Lower Klamath Refuge.  ASP further argues that the EIS/CCP violates the Kuchel Act, the Refuge Act, and the APA because it does not sufficiently prioritize the preservation of wildlife habitat over agricultural uses of leased agricultural land ("lease land") in the refuges.  ASP also argues that the EIS/CCP violates the Refuge Act because it delegates day-to-day administrative responsibilities to the Bureau of Reclamation ("Bureau").  Finally, ASP argues that the EIS/CCP violates NEPA because it does not adequately evaluate an alternative that would reduce the acreage of lease land in the Tule Lake and Lower Klamath Refuges.

We affirm the district court.

## I.  Statutory Background

The Klamath Refuge Complex encompasses approximately 200,000 acres in northern California and southern Oregon.  It consists of six national wildlife refuges, including the Tule Lake and Lower Klamath Refuges. "Historically, the Klamath Basin was dominated by approximately 185,000 acres of shallow lakes and freshwater marshes."  Today, however, "less than 25% of these historic marshes and shallow wetlands remain."  The wetlands habitats that remain "provide[] home to many species of migratory birds and other wildlife and plant species."

Two key statutes govern the Service's management of refuges in the Klamath Refuge Complex. First, the Kuchel Act, enacted in 1964, governs four of the six refuges in the Complex. The Act provides in relevant part:

> Notwithstanding any other provisions of law, all lands owned by the United States lying within the Executive order boundaries of the Tule Lake National Wildlife Refuge, the Lower Klamath National Wildlife Refuge, the Upper Klamath National Wildlife Refuge, and the Clear Lake Wildlife Refuge are hereby dedicated to wildlife conservation. Such lands shall be administered by the Secretary of the Interior for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith.

16 U.S.C. § 695*l*. The Kuchel Act requires the Secretary to, "consistent with proper waterfowl management, continue the present pattern of leasing" in designated areas in the Lower Klamath and Tule Lake Refuges. *Id.* § 695n.

Second, the Refuge Act governs the entire National Wildlife Refuge System, including the refuges in the Klamath Refuge Complex. *Id.* § 668dd. The Refuge Act mandates the preparation of Comprehensive Conservation Plans for all wildlife refuges in the Refuge System. *Id.* § 668dd(e)(1)(A). The Act requires that "each refuge . . . be managed to fulfill the mission of the [National Wildlife Refuge System], as well as the specific purposes for which that refuge was established." *Id.* § 668dd(a)(3)(A). The Secretary of the Interior ("Secretary") may permit any use of a refuge

"whenever [s]he determines that such uses are compatible with the major purposes for which such areas were established." *Id.* § 668dd(d)(1)(A). Uses are considered compatible if they "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." *Id.* § 668ee(1).

## II. Water Scarcity

The fundamental wildlife management problem in the Tule Lake and Lower Klamath Refuges is water scarcity. The Service wrote in the EIS/CCP that a "key component" in the development of alternative strategies for the refuges was "the availability of water for refuge management purposes."

The Service's ability to provide water for use in the Tule Lake and Lower Klamath Refuges is severely limited. The two refuges, particularly the Lower Klamath Refuge, depend heavily on the Klamath Reclamation Project ("Project") for water. In recent years, factors outside the control of the Project have significantly reduced the amount of Project water available for the refuges. In addition to the important factors detailed in the paragraphs that follow, such factors include increases in electrical power costs (which makes pumping of water much more expensive), extended droughts, and tribal trust obligations.

First, five species of fish found in the Klamath Basin have been listed as threatened or endangered under the Endangered Species Act ("ESA"), requiring the Project to prioritize the diversion of water flows in order to protect these species. In 2013, the Service and the National Marine Fisheries Service issued a joint Biological Opinion ("2013 BiOp") that now governs the Project's compliance with the ESA. Nat'l Marine

Fisheries Serv. & U.S. Fish & Wildlife Serv., SWR-2012-9372, Biological Opinions on the Effects of Proposed Klamath Project Operations from May 31, 2013, through March 31, 2023, on Five Federally Listed Threatened and Endangered Species (2013). According to the EIS/CCP, "The 2013 BiOp has a large influence on how much and when water is available within . . . the Klamath Reclamation Project."

Second, surface water rights in the Upper Klamath Basin are largely determined under Oregon state law. The relative priorities of Oregon water rights in the Basin are set out in a March 2013 Final Order of Determination ("FOD") issued by the Oregon Water Resources Department ("OWRD"). The FOD gave the Service nearly 85,000 acre-feet of senior water rights, with an assigned priority date of 1905, for irrigation uses in the Tule Lake and Lower Klamath Refuges. In a 2014 amendment to the FOD, the OWRD concluded that use of water for the purpose of growing wetland plants is not an irrigation use within the meaning of the Service's 1905 water rights. The United States has challenged the OWRD's 2014 amendment in the Klamath County Circuit Court, but no final decision is expected within the 15-year life of the EIS/CCP. In the meantime, the 2014 amendment to the FOD controls. The Service believes that use of water for its so-called "walking wetlands" program, in which agricultural land in the Tule Lake Refuge is periodically flooded on a rotating basis, is irrigation within the meaning of its 1905 water rights. (See below for a further description of the walking wetlands program.) Remaining federally owned water rights for the Tule Lake and Lower Klamath Refuges are not limited to irrigation uses, but they have been assigned priority dates of 1925 and later.

Third, rights to federally owned water within the Project are determined by the federal Bureau of Reclamation. The Bureau classifies water rights within the Project as having A, B, or C priority, with "A priority" water users receiving water first. The refuges have not fared equally well under the Bureau's classification system. Lease land in the Tule Lake Refuge has an A priority. However, lease land in the Lower Klamath Refuge has a B priority. Irrigated non-lease land in the Lower Klamath Refuge has not been assigned a priority. According to the EIS/CCP, unresolved within-Project priorities have contributed to "drastic[] decline[s]" in the amount of water diverted to Lower Klamath Refuge.

Finally, recent political attempts to resolve the myriad water disputes in the Klamath Basin have been unsuccessful. The United States; the States of California and Oregon; the Klamath, Karuk, and Yurok Tribes; Klamath Project water users; and various other stakeholders negotiated a Klamath Basin Restoration Agreement ("KBRA") in an effort to resolve disputes in the region over natural resources. However, Congress failed to take action to implement the KBRA and allowed it to expire in 2016.

## III. Agriculture in the Refuges

Portions of both the Tule Lake and Lower Klamath Refuges are leased to individuals and private companies for agricultural use. In the Tule Lake Refuge, 14,800 acres are dedicated to lease-land farming of grains; alfalfa; and row crops, predominantly potatoes and onions. In the Lower Klamath Refuge, a 5,605-acre parcel is dedicated to lease-land farming of barley, oats, wheat, and hay. In both refuges, additional land is made available for agricultural use through a Cooperative Farmland Program that is managed by the

Service. The Cooperative Program permits farmers to harvest three-quarters of the crop grown on these lands if they leave the remaining one-fourth standing in the field "for the benefit of wildlife."

Farming in the two refuges has a mixed impact on wildlife. Lease-land farming directly reduces land that might otherwise be available for waterfowl as wetlands. Most of the crops grown on lease land are harvested rather than left for wildlife. Some of the crops are left unharvested, but, according to the EIS/CCP, these crops alone "do not meet complete nutrition needs" for wildlife because they contain "lower amounts of proteins, minerals, and key amino acids than other natural foods."

However, some of the crops grown on lease land can provide nutritional benefits to wildlife that foods on natural wetlands do not. According to the EIS/CCP, "some agricultural crops, including standing grains[,] provide a rich source of carbohydrates and provide more food (kcal/acre) for less water than wetland plant crops, which is particularly important for migrating dabbling ducks and geese." Further, assuming that the relative priority of water rights does not change in the future, lease land is, and will be, useful in drought years because of lease-land agricultural-use priority under the Service's 1905 water rights. In those years, lease land "provide[s] some of the only food resources available to waterfowl on the Refuge." The Cooperative Farmland Program of the Klamath Refuge Complex also provides benefits to waterfowl, guaranteeing that a minimum amount of unharvested crops will be preserved as food for wildlife.

In the 1990s, the Service adopted a "walking wetlands" program for the Tule Lake Refuge, under which the Service

rotationally floods agricultural fields for anywhere from one to four years to turn them into short-term wetlands before they are returned to agricultural production. This program has benefitted both waterfowl that use the flooded fields as wetland habitat and farmers who have experienced improved agricultural productivity and reduced costs after the flooding period. Additionally, the program is useful because, as noted above, although Oregon prevents use of 1905 irrigation water rights for purely wetlands purposes, the Service believes that such rights can be used to deliver water to the walking wetlands.

## IV.  The Combined EIS/CCP

In its combined EIS/CCP, the Service considered three agricultural habitat management alternatives for the Tule Lake Refuge, and four alternatives for the Lower Klamath Refuge. None of the alternatives would have substantially reduced the lease land acreage available for agriculture in the two refuges.

For the Tule Lake Refuge, the Service selected Alternative C. That alternative continues many of the agricultural management strategies that were already in place. In addition, Alternative C increases the required acreage of unharvested standing grain from 1,100 to 1,500 acres, half of which is to come from cooperative farm lands and the other half from lease land. Alternative C also "strive[s] to increase acreage and interspersion of walking wetlands within lease lands so that all fields are within 1 mile of a wetland." The walking wetlands program was framed as an aspiration rather than a mandate because in some drought years not enough water will be available for the program.

For the Lower Klamath Refuge, the Service selected Alternative C.  Like Alternative C for Tule Lake Refuge, that alternative incorporates many of the agricultural management strategies that were already in place, including an increase in the acreage of cooperative farming when water is not available for seasonal wetlands, as well as incentives for cooperative farmers to provide wetlands on private lands outside the refuge.  Alternative C also adds new practices, including an increase in the amount of grain cooperative farmers must leave unharvested by 1,500 acres.  In years when this goal cannot be met, the Service would work with the Bureau to revise lease contracts so that lessees would be required to leave 25% of their fields unharvested.  Further, "[s]ubject to the availability of water, the Service would . . . increase the use of the flood fallow agricultural practice on fields with expiring contracts. . . ."

## V.  Proceedings Below

A magistrate judge issued a Report and Recommendation in which he recommended granting summary judgment to the Service.  The district court adopted the recommendation of the magistrate judge in its entirety.  ASP timely appealed.

## VI.  Standard of Review

"We review summary judgment rulings de novo." *Native Ecosystems Council v. Marten*, 883 F.3d 783, 789 (9th Cir. 2018) (citing *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1256 (9th Cir. 2017)).  For APA challenges, courts uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Arbitrary and capricious review is "deferential," *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022

(9th Cir. 2007), but an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

## VII.  Arguments on Appeal

ASP argues on appeal that the failure of the Service under the EIS/CCP to provide sufficient water for the Lower Klamath Refuge violates the Refuge Act; that the EIS/CCP's continuation of the present pattern of agricultural leasing in the Tule Lake and Lower Klamath Refuges violates the Kuchel and Refuge Acts, and is arbitrary and capricious in violation of the APA; that the EIS/CCP delegates administrative responsibilities to the Bureau of Reclamation in violation of the Refuge Act; and that the failure of the EIS/CCP to consider a reduced-agriculture alternative violates NEPA.  We address each argument in turn.

### A.  Failure to Provide Sufficient Water for the Lower Klamath Refuge

The Refuge Act provides in relevant part:

> (4) In administrating the [Refuge] System, the Secretary shall—
>
> . . .
>
> (F) assist in the maintenance of adequate water quantity and water quality to fulfill

the mission of the System and purposes of each refuge;

(G) acquire, under State law, water rights that are needed for refuge purposes.

16 U.S.C. § 668dd(a)(4)(F), (G).

ASP argues with respect to the Lower Klamath Refuge that the EIS/CCP does not do enough to "assist in the maintenance of adequate water quantity," *id.* § 668dd(a)(4)(F), and to "acquire, under State law, water rights that are needed for refuge purposes," *id.* § 668dd(a)(4)(G). The EIS/CCP admits that Alternative C, its selected management alternative, does not guarantee sufficient water delivery to the Lower Klamath Refuge to meet waterfowl habitat objectives. For example, the EIS/CCP states forthrightly that, under estimates of water delivery based on the 2013 BiOp prepared jointly by the Service and the National Marine Fisheries Service, "[i]n all but the wettest years . . . water deliveries [in the Lower Klamath Refuge] would fall well short of habitat needs."

ASP characterizes the EIS/CCP, with respect to the Lower Klamath Refuge, as "devoid of any management action that will assist in maintaining adequate water resources or securing needed water rights for the Refuge during the 15-year life of the Plan," and as having a "management 'strategy' [that] is effectively a commitment by the Service to do nothing." While it is true that the EIS/CCP is pessimistic about the ability of the Service to increase water delivery to the Lower Klamath Refuge, it is not true that under the EIS/CCP the Service is doing, or will do, nothing. The CCP is designed, in the words of the Service, "to provide a

conceptual, flexible approach, which will necessarily be fleshed out further in subsequent planning." As the EIS/CCP notes, the government has sought an amendment to Oregon's water rights adjudication FOD that would allow the Service's 1905 water rights to be used for purely wetlands purposes. The EIS/CCP acknowledges that an adjudication of this issue is not likely within the life of the EIS/CCP, but it is hardly the case that the government has taken no action.

We are sympathetic to the concerns of ASP. All agree that the water currently available for the Lower Klamath Refuge is inadequate to serve the purposes of the refuge. But we are also cognizant of the constraints on the Service, whose ability to provide water is severely limited. We are satisfied on the record before us, given the constraints on the Service, that the EIS/CCP fulfills the Service's obligation to "assist in the maintenance of adequate water quantity . . . to fulfill the mission of the System and purposes of each refuge," and to "acquire, under State law, water rights that are needed for refuge purposes." 16 U.S.C. § 668dd(a)(4)(F), (G). *Cf. Defs. of Wildlife v. Salazar*, 651 F.3d 112, 117 (D.C. Cir. 2011) (holding, in interpreting 16 U.S.C. § 668dd(a)(4)(E), that the "Secretary [has] broad managerial discretion in how to pursue the Act's objectives").

### B. Continuation of Present Pattern of Agricultural Leasing in the Tule Lake and Lower Klamath Refuges

The Kuchel Act, applicable to four of the five refuges covered by the Service's EIS/CCP, including the Tule Lake and Lower Klamath Refuges, provides in relevant part:

> [A]ll lands owned by the United States lying within the Executive order boundaries of the

> Tule Lake National Wildlife Refuge, the
> Lower Klamath National Wildlife Refuge, the
> Upper Klamath National Wildlife Refuge, and
> the Clear Lake Wildlife Refuge are hereby
> dedicated to wildlife conservation. *Such
> lands shall be administered by the Secretary
> of the Interior for the major purpose of
> waterfowl management, but with full
> consideration to optimum agricultural use
> that is consistent therewith.*

16 U.S.C. § 695*l* (emphasis added).     The Act further
provides:

> The Secretary *shall, consistent with proper
> waterfowl management, continue the present
> pattern of leasing [specified] reserved lands
> . . . within . . . the Executive order boundaries
> of the Lower Klamath and Tule Lake National
> Wildlife Refuges . . . .*

*Id.*§ 695n (emphasis added).

The Refuge Act governs the National Wildlife Refuge
System, including the Klamath Refuge Complex. The Act
defines the mission of the System as "administer[ing] a
national network of lands and waters for the conservation,
management, and where appropriate, restoration of the fish,
wildlife, and plant resources and their habitats within the
United States." *Id.* § 668dd(a)(2). The Act provides that
"each refuge shall be managed to fulfill the mission of the
System, *as well as the specific purposes for which that refuge
was established*." *Id.* § 668dd(a)(3)(A) (emphasis added).

The Act authorizes the Secretary of Interior to "permit the use of any [refuge] . . . for any purpose . . . *whenever he determines that such uses are compatible with the major purposes for which such areas were established*." *Id.* § 668dd(d)(1)(A) (emphasis added).

The terms "proper waterfowl management" and "present pattern of leasing" are not defined in the Kuchel Act. In Appendix M to the EIS/CCP, the Service analyzed the Act to define these terms. The EIS/CCP defines "proper waterfowl management" as:

> providing habitats sufficient to support waterfowl population objectives throughout the annual cycle while promoting the highest possible natural biological diversity of refuge habitats. A sufficient quantity and diversity of foraging resources should be provided that will meet the energy requirements and nutritional demands of all waterfowl species. Where feasible, natural foods should be given priority over agricultural crops.

The EIS/CCP does not define "present pattern of leasing," but it does specify that whatever the "cropping pattern," that pattern must be "consistent with proper waterfowl management." In order to be consistent,

> the overall program must provide sufficient food resources to support population objectives for waterfowl (dabbling ducks and geese) during the spring and fall migration. In addition, post-harvest farming practices and

> other practices must be implemented that will
> increase the attractiveness of the fields for
> foraging waterfowl and disperse waterfowl
> use as widely in the leased lands as possible.

ASP argues that the EIS/CCP violates the Kuchel and Refuge Act by continuing the current pattern of agricultural leasing in the Tule Lake and Lower Klamath Refuges. It argues that "[t]he Service . . . acted arbitrarily and capriciously when it authorized uses pursuant to the present pattern of leasing to continue in a manner that will impair Refuge habitats and interfere with proper waterfowl management," in violation of the APA. *See* 5 U.S.C. § 706(2)(A).

ASP disagrees with a number of choices made by the Service in the EIS/CCP. Its core argument is that the EIS/CCP authorizes an improper mix of agricultural land and natural habitat. ASP writes that "[b]y authorizing the full scale of leasing to continue, even in times of drought, the Service is prioritizing commercial agricultural crops over natural foods and wetland habitats . . . ." ASP argues that the "prioritizing" of agriculture in the refuges results in an inappropriate ratio of natural and farmed foods available for waterfowl. ASP particularly objects to cultivation of horseradish and onions, two of the row crops grown on lease lands in the Tule Lake Refuge, pointing out that these two crops provide no nourishment to waterfowl. ASP praises the "walking wetlands" program implemented in the Tule Lake Refuge, but argues that the program should have been extended to the Lower Klamath Refuge. It also points out that the EIS/CCP allows agricultural runoff from the lease land that degrades the quality of water available for wildlife.

In the EIS/CCP, the Service considered the arguments made by ASP. The Service recognized that grains grown on farmed land in the refuges are nutritionally incomplete as compared to natural foods, but, at the same time, it noted in the EIS/CCP that such grains provide more concentrated calories than natural foods. The Service recognized that horseradish and onions do not provide any nutritional benefit to wildfowl, but it wrote in the EIS/CCP that they "may be important crops in soil rotation for reducing pests and improving soil health." Further, the Kuchel Act specifically contemplates that row crops will be grown on lease land, allowing up to twenty-five percent of lease land to be used for that purpose. *See* 16 U.S.C. § 695n ("The leases shall provide for the growing of grain, forage, and soil-building crops, except that not more than 25 per centum of the total leased lands may be planted to row crops."). The Service considered extending the walking wetlands program to the Lower Klamath Refuge, but concluded that such an extension was unnecessary because "grain [in the Lower Klamath Refuge] is sufficiently interspersed throughout the wetland units[.]"

The EIS/CCP recognized that poor water quality in the refuges is caused in part by agricultural runoff, some of it coming from upstream of the refuges and some of it coming from within the refuges. The EIS/CCP noted that poor water quality is also attributable in part to "nutrients and other chemicals from nonpoint sources [upstream from the refuges], including flood irrigation and cattle use of pasture lands, and urban, logging, and agricultural land disturbances," as well as point sources upstream from the refuges, including upstream sewage treatment plants and dairies. The EIS/CCP also noted that "refuge staff" will participate in developing a

plan for the Upper Klamath Basin as part of an "Agricultural Discharge program" implemented by the California North Coast Water Quality Control Board.  The EIS/CCP provides, "When completed, the Service will assess what modifications to the farming program might be warranted to be in compliance with the plan."

The Kuchel Act requires nothing more.  The Service defined "proper wildfowl management," recognized that the "present pattern of leasing" must be consistent with such management, and exercised its considered professional judgment in striking an appropriate balance between the two. Given the extensive evidence in the record supporting the choices made by the Service, we see nothing that would authorize us, as a reviewing court, to make different choices. We hold that the balance struck by the EIS/CCP, with respect to the issues raised in this appeal, is consistent with the Kuchel and Refuge Acts, and with the APA.

## C.  Delegation to Bureau of Reclamation

Section 668dd(a)(1) of the Refuge Act provides that all refuge lands "shall be administered by the Secretary through the United States Fish and Wildlife Service."  16 U.S.C. § 668dd(a)(1).  ASP contends that the EIS/CCP violates § 668dd(a)(1) because it authorizes the Bureau of Reclamation to administer lease land in the Tule Lake and Lower Klamath Refuges.  We hold that the Bureau's responsibilities under the EIS/CCP are not "administration" within the meaning of the Refuge Act's anti-delegation provision.

The EIS/CCP incorporates a 1977 Cooperative Agreement between the Service and Bureau that assigns to the Bureau specified management functions with respect to lease land in the Lower Klamath and Tule Lake Refuges. The Bureau's performance of those functions is subject to the Service's direction and approval. The Agreement provides that any action by the Bureau is "subject to the ultimate administrative control of the Service." For example, the Bureau must "consult with and obtain the approval of the Service in developing the agricultural leasing program"; all lease advertisements must be submitted to the Service for approval; and the Bureau must "practice soil moisture conservation" and "conduct salt balance studies" as directed by the Service. Further, the Bureau is required to re-apply annually to the Service for a special-use permit, which requires agreement by the Bureau that the lease land program will be administered according to the Service's stipulations. Finally, "[a]ny management function of the Bureau . . . may be terminated at any time" by the Service.

Our decision in *Trustees for Alaska v. Watt*, 524 F. Supp. 1303 (D. Ala. 1981), *aff'd per curiam*, 690 F.2d 1279 (9th Cir. 1982) (affirming "[o]n the basis of the district court's thorough and well-reasoned opinion"), is not to the contrary. In *Trustees for Alaska*, we upheld the district court in striking down as inconsistent with the Refuge Act the Service's transfer of "lead responsibility for the Arctic National Wildlife Refuge report and exploration regulations from U. S. Fish and Wildlife Service (FWS) to U. S. Geological Survey (USGS)." *Trs. for Alaska*, 524 F. Supp. at 1307. The functions transferred to USGS included promulgating regulatory guidelines, accompanied by environmental impact statements; approving plans for oil and gas exploration of the

refuge; and reporting to Congress the results of exploration in the refuge, the effect of that exploration on fish and wildlife, and making recommendations with respect to further exploration.  *Id.* at 1309–10; *see* 16 U.S.C. § 3142 (d), (e), (h).  In contrast to the extensive and unsupervised transfer of functions in *Trustees for Alaska*, the Bureau in the case before us is assigned specified management functions and is, in all respects, subject to the supervision and approval of the Service.

### D.  Failure to Consider a Reduced-Agriculture Alternative

NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). "[F]or alternatives which were eliminated from detailed study," an agency must "briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a). (We cite to the 1978 versions of NEPA's implementing regulations, which were in effect at the time the record of decision in the present case was issued.)   An EIS need not consider and address every conceivable alternative, only those that are "viable" and that further a particular project's policy objectives.  *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt. (ONDA II)*, 625 F.3d 1092, 1122 (9th Cir. 2010).   "In reviewing the adequacy of an EIS under NEPA, we employ 'a rule of reason' analysis to determine whether the discussion of the environmental consequences included in the EIS is sufficiently thorough."  *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020) (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002)).

ASP argues that the EIS/CCP violates NEPA by failing to consider and analyze a listed alternative that would decrease the acreage of lease land available for agriculture. We disagree.

We hold the Service sufficiently considered whether to reduce the acreage devoted to lease-land farming, and sufficiently explained why it did not list such reduction as an alternative in the EIS/CCP. For the Tule Lake and Lower Klamath Refuges, the Service briefly considered the alternatives of eliminating lease land farming entirely and of "[c]urtail[ing] agriculture in years when only partial water deliveries are made." It rejected both alternatives and declined to list them as formal alternatives in the EIS/CCP.

For both refuges, the EIS/CCP gave two reasons why it did not include the elimination of lease land farming as a listed alternative:

> For migrating and wintering waterfowl, food is believed to be the most limiting resource. As a result, conservation planning for waterfowl outside of the breeding season is largely focused on providing sufficient foraging habitat. A Service review of waterfowl management (see Appendix M) on Lower Klamath and Tule Lake Refuges determined that leased agricultural lands represent a component of the overall refuge habitat mosaic and contribute to proper waterfowl management.

> Also, . . . agriculture on the refuge is generally assured of receiving water in most years whereas wetland areas are not. Without some degree of water supply reliability, which is provided through irrigation water, sufficient food resources for waterfowl could not be produced. Although the Service has filed exceptions to the [2013 Oregon FOD] adjudication in court, the issue likely will not be resolved for many years.

For the Tule Lake Refuge, the EIS/CCP gave a reason why it did not include the curtailment of agriculture on lease lands "in years when only partial water deliveries are made":

> [A]ny water savings from a reduced irrigation program on the refuge would simply make more water available to higher priority Project water users rather than to refuge wetlands. In addition, changes in the purpose of water rights to allow use of the water in wetlands are not permitted until the Klamath River Basin adjudication is finalized. . . . In addition, curtailing agriculture is also likely to result in large weed infestations on lease lands. . . . Therefore, this management action was not included in any of the alternatives.

ASP objects that these explanations address only the questions why the EIS/CCP did not include the alternative of entirely eliminating lease land agriculture, and, for the Tule Lake Refuge, did not include the alternative of eliminating lease land agriculture in drought years. We agree with ASP

that these explanations in the EIS/CCP do not directly address the question why the alternative of reducing lease land agriculture was not included.  But such reasons may be easily inferred from the reasons given for not listing the elimination of lease land agriculture or curtailing of agriculture on lease lands during drought years.  *See State Farm*, 463 U.S. at 43 (upholding "a decision of less than ideal clarity if the agency's path may reasonably be discerned" (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

As the EIS/CCP explains, lease land agriculture in the two refuges provides two benefits.  First, it provides a supplemental food source for waterfowl.  Second, reducing the amount of lease land acreage would reduce the amount of water available to the refuges.  Because the Service's 1905 water rights are available only for irrigation of crops and for the Service's walking wetlands program on lease land, reducing the amount of lease land acreage "would simply make more water available to higher priority Project water users [outside the refuges] rather than to refuge wetlands." These two reasons support the Service's decision not to list as a formal alternative the complete elimination of lease land agriculture in the refuges.  They equally support its decision not to list as an alternative the reduction of such agriculture.

The Service has requested an amendment to the FOD that would allow water available under its 1905 water rights to be used for purely wetland uses.  The EIS/CCP repeatedly, and properly, points to that request in response to ASP's argument that the Service has "done nothing" to increase the supply of water to the refuges.  If and when the Service's request is granted, the Service may need to revisit its reasons for

rejecting the reduction of lease land agriculture as a formal alternative, for if the request is granted reduction in lease land agriculture will not result in a reduction of the water available for the refuges.  But unless and until that request is granted, the Service has sufficiently explained why it did not present such reduction as a formal alternative in the EIS/CCP.

## Conclusion

To the degree the present pattern of agricultural leasing in the Tule Lake and Lower Klamath Refuges is consistent with proper waterfowl management in those refuges, the Kuchel and Refuge Acts direct the Service to continue that present pattern of leasing.   In developing a Comprehensive Conservation Plan for the Tule Lake and Lower Klamath Refuges, the Service was constrained by the fact that frequent droughts in the region prevent the refuges from fully realizing the goals of proper waterfowl management in those refuges. The Service was further constrained by a complex system of water rights that is largely beyond its control.  In reviewing the EIS/CCP, we recognize these constraints and defer to the reasoned explanations provided by the Service in support of its decisions.

**AFFIRMED.**